STATE OF NEW JERSEY, PLAINTIFF-RESPONDENT,
v. FRANK J. CONFORTI, DEFENDANT-APPELLANT.

Argued December 5, 1968—Decided February 3, 1969.

240

Mr. *Archibald Kreiger,* Assistant Prosecutor of Passaic County, argued the cause for plaintiff-respondent (*Mr. John G. Thevos,* Passaic County Prosecutor, attorney).

Mr. *Joseph J. Vanecek* argued the cause for defendant-appellant (*Mr. George L. Garrison* on the brief).

The opinion of the court was delivered

PER CURIAM. This is an appeal from a jury verdict of murder in the second degree. The State had sought a capital verdict of first degree murder.

The following facts were proved at the trial:

Defendant contracted to sell his tavern to a corporation consisting of the two sisters and the so-called "common-law wife" of the deceased Roy Holloway. Although Holloway was the real purchaser, he did not take the license in his name due to a then-recent conviction of illegal possession of untaxed alcohol. The closing date stated in the contract was June 15. However, the contract also provided for closing on or about the day following receipt of the transfer of the liquor license and issuance of a restaurant license by the City of Paterson. The transfer of the liquor license was accomplished on June 10. On that date the parties inventoried the stock, and Holloway, at defendant's suggestion, took actual possession, although there had been no transfer of the lease of the premises or final closing. Defendant worked for Holloway in the bar that night and the next day. On June 13, he demanded the balance of the money due him, having already received, in addition to the initial contractual down payment, $100 from both Holloway and his lawyer for the same utility deposit. Holloway's attorney advised that no

further payments would be forthcoming until final settlement. There was no closing on June 15. On June 16, the date of the killing hereafter detailed, defendant had been out of possession since June 12 and had received only $500 cash, plus $200 for utility deposit on account of the purchase price of $5,000.

On the evening of June 16, Holloway and defendant entered the bar at about 8 o'clock. They talked for a "couple of seconds." Then defendant, who had lived in the building until shortly prior to this date, went to the bar and asked for his mail. He received it and left. When he returned some fifteen or twenty minutes later, he inquired of deceased, "Roy, are you buying?" Upon Holloway's affirmative reply, the two had a drink together. Defendant downed a shot of whiskey, drank half of his beer and left. A few minutes later he reappeared in the doorway, carrying a shotgun which he aimed at Holloway from a distance of ten or twelve feet. Holloway said "watch out," then a load of birdshot hit him in the shoulder and spun him around. He staggered toward defendant, who took deliberate aim and fired again, blowing a three by four inch hole in Holloway's head.

Defendant ran out of and to the rear of the building, ejecting two shells from the gun. He disappeared behind the building for a few minutes. The bartender and two of the three customers, who were present during the foregoing, fled from the building. The third customer hid in the men's room. Defendant reappeared carrying the shotgun, approached the entrance to the tavern, looked around and re-entered. The police having been called, Detective Callahan arrived within a few minutes. When he entered he found the barroom deserted except for defendant and the profusely bleeding body of Holloway. Defendant was behind the bar with the double-barrelled shotgun pointed at the door. Crouching behind the corner of a pool table, the detective rested his revolver on the top and told defendant to drop the gun. He said, "I don't want to kill you." Defendant, pointing the gun at the officer, replied

"I know you are a Detective Policeman. I am not angry with the cops. I don't want to hurt you and I don't want you to hurt me."

There ensued the following conversation,

"Frank, put the gun down. You already hurt one man. I don't want you to hurt me."
"Allright, Mr. Callahan, I know you won't hurt me."

Defendant put down the gun and raised his hands. Callahan removed two live 12-gauge shells from the gun. Eight more were removed from defendant's trouser pockets and 26 more were later found in his car, parked alongside the tavern. Defendant offered no resistance as he was escorted to the police car. Callahan testified that, on the way to the police station, he inquired of defendant what the trouble was and

"he said that these people had bought the tavern from him. They only paid him part of the money. He was down to try to collect the rest of it. They were laughing and making jokes. They weren't going to pay me.

\* \* \*

\* \* \* he had been there on several occasions to try to collect the rest. Every time he went down there they made a big joke of his trying to collect the money."

Defense counsel admitted in his opening that defendant had killed the deceased, and he rested the defense on his client's alleged insanity at the time of the homicide. As above noted, he was convicted of murder in the second degree.

Defendant's appeal is five-pronged. He argues for a reversal on the asserted grounds that:

I. The court committed reversible error by refusing to charge that, if the jury were to acquit defendant by reason of insanity and to specifically find that the insanity continued to the time of trial, he would be automatically committed to the state hospital until restored to reason.
II. The verdict of second degree murder was a compromise verdict and unsupported by the evidence.
III. The court committed reversible error by admitting photographs and incidental testimony relating to the nature of

victim's injuries when defendant admitted the shooting and killing and four eyewitnesses testified as to its details.

IV. The court committed reversible error by refusing to strike the testimony of one of the State's medical experts because of the doctor's misstatement of the M'Naghten Rule.

V. Defendant was prejudiced by the court's perfunctory dismissal of prospective jurors on the sole ground that they were opposed to capital punishment.

The grounds so argued will be considered in the above order. Defendant contends that:

# I

*The court committed reversible error by refusing to charge that, if the jury were to acquit defendant by reason of insanity and to specifically find that the insanity continued to the time of trial, he would be automatically committed to the state hospital until restored to reason.*

 The Appellate Division in *State v. Bell,* 102 *N. J. Super.* 70, at *p.* 75 (*App. Div.* 1968) *cert. denied* 52 *N. J.* 485 (1968) stated:

"* * * we decline to adopt the minority view, as exemplified by *Lyles v. United States,* 103 *U. S. App. D. C.* 22, 254 *F. 2d* 725 (*D. C. Cir.* 1957), *certiorari* denied 356 *U. S.* 961, 78 *S. Ct.* 997, 2 *L. Ed. 2d* 1067 (1958), 362 *U. S.* 943, 80 *S. Ct.* 809, 4 *L. Ed. 2d* 771 (1960), 368 *U. S.* 992, 82 *S. Ct.* 610, 7 *L. Ed. 2d* 529 (1962), that a jury must be informed of the consequences of a verdict of not guilty by reason of insanity unless the defendant specifically requests otherwise. See also *Taylor v. United States,* 95 *U. S. App. D. C.* 373, 222 *F. 2d* 398 (1955) ; *McDonald v. United States,* 114 *U. S. App. D. C.* 120, 312 *F. 2d* 847, 851 (1962). Compare *Pope v. United States,* 298 *F. 2d* 507 (5 *Cir.* 1962), *certiorari* denied 381 *U. S.* 941, 85 *S. Ct.* 1776, 14 *L. Ed. 2d* 704 (1965). Generally speaking, the jury's duty, as distinguished from that of the court, is to decide the issue of defendant's guilt or innocence. The defense of insanity does no more than present a question for the jury's consideration in determining that issue. *State v. Ordog,* 45 *N. J.* 347, 371 (1965), *certiorari* denied 384 *U. S.* 1022, 86 *S. Ct.* 1942, 16 *L. Ed. 2d* 1025 (1966). After the jury has made its determination it becomes the duty of the court, with minor exceptions not relevant here, to impose sentence or make such other disposition as is required by law. In making its determination,

the jury should not be influenced by a consideration of what will be the result of its verdict, nor should its attention be distracted from its chief function. *Pope v. United States, supra; State v. Hood,* 123 *Vt.* 273, 187 *A. 2d* 499, 11 *A. L. R. 3d* 732 (*Sup. Ct.* 1963) ; *State v. Park,* 159 *Me.* 328, 193 *A. 2d* 1, 5 (*Sup. Jud. Ct.* 1963). See also Annotation, 'Criminal Case — Instructions — Insanity,' 11 *A. L. R. 3d* 737 (1967). *Cf. State v. White,* 27 *N. J.* 158, 170–178 (1958)."

The foregoing quoted portion of the *Bell* opinion is the answer to defendant's contention.

## II

*The verdict of second degree murder was a compromise verdict unsupported by the evidence.*

Defendant bottoms his argument on this point upon the theory that "the jury was presented with a perfect first degree murder case" and that "the only basis upon which the jury could rationally have come to a conclusion that defendant was guilty not of first degree murder but second degree murder would be that the jury did believe that the defendant was insane at the time of the commission of the offense in question, and therefore by compromise, reduced the first degree murder finding to a verdict of second degree murder."

What defendant overlooks is that in his summation he argued that it was the jury's "responsibility" to "decide whether or not defendant is guilty of murder in the first degree," and "it will be your responsibility, your serious responsibility of deciding whether or not he is guilty of murder in the second degree and it will be equally your responsibility to decide whether he is not guilty by reason of insanity." In connection with the question of murder in the first degree, counsel argued that defendant neither premeditated nor deliberated because he lacked the mental capacity to premeditate or deliberate. Counsel therefore concluded that since two of the three essential ingredients for

first degree murder were missing, defendant could not be guilty of that offense. This argument related to possible guilt of second degree murder rather than first degree, not to complete absence of guilt because of insanity.

Defendant further overlooks that ‛portion of the court's charge, in which he acquiesced, which correctly instructed the jury that in determining whether defendant did in fact premeditate and deliberate, they should consider the evidence bearing upon his mental capacity to do so, and if, because of "any mental defect, mental deficiency, or mental weakness, and the proof of any trait, condition or illness or any other cause or combination of causes" they concluded that he did not premeditate or deliberate, they could not find him guilty of murder in the first degree but could find him guilty of murder in the second degree.

The conclusion that the verdict of murder in the second degree was a compromise verdict is unsupportable. The verdict was not against the weight of the evidence. The testimony of defendant's psychiatric experts was adequate to support a finding that, although defendant was not insane under *M'Naghten,* at the time of the commission of the homicide, he lacked the mental capacity to deliberate or premeditate and could be guilty of murder in the second degree rather than murder in the first degree. See *State v. DiPaolo,* 34 *N. J.* 279, *pp.* 294–297 (1961).

We find no merit in this asserted ground for reversal.

### III

*The court committed reversible error by admitting photographs and incidental testimony relating to the nature of victim's injuries when defendant admitted the shooting and killing and four eyewitnesses testified as to its details.*

Defendant stresses that as the homicide was admitted, none of the testimony and photographs relating to the condition of the body of the deceased were necessary to prove the killing. He further states that they were inadmissible

for any other purpose, as, according to defendant, the single issue of the trial was his sanity. This, however, is not accurate, for if the jury found defendant sane, they then would have to determine the degree of the murder, and if first degree, the punishment to be imposed upon defendant. All of the testimony and the exhibits had probative value on the question of defendant's malice, willfulness and murderous desire, as well as the enormity of the offense, which the jury could consider in deliberating on the issue of the punishment to be meted out. Although much of the evidence on this subject and many of the photographic exhibits could be considered cumulative, their relevance was not overbalanced by any possible prejudicial quality. They were not of such at nature as to warrant their exclusion. The court did not abuse its discretion in overruling defendant's objections thereto.

## IV

*The court committed reversible error by refusing to strike the testimony of one of the State's medical experts because of the doctor's misstatement of the M'Naghten Rule.*

We find no merit in defendant's objection to the court's refusal to strike the testimony of one of the State's experts. The doctor expressed his opinion on defendant's sanity on direct examination in answer to a properly phrased hypothetical question which included a request for such an opinion in the language of the critical essentials of the M'Naghten Rule. Actually, the doctor's statement on cross-examination accorded defendant a more beneficial test. We find no merit in this ground argued by defendant.

## V

*Defendant was prejudiced by the court's perfunctory dismissal of prospective jurors on the sole ground that they were opposed to capital punishment.*

It is difficult to follow defendant's reasoning on this point in the light of the fact that he was convicted of second degree and not first degree murder and the jury therefore was not required to consider the question of punishment. See *Bumper v. North Carolina*, 391 *U. S.* 543, 88 *S. Ct.* 1788, 20 *L. Ed. 2d* 797 (1968), where the court refused to apply *Witherspoon v. Illinois*, 391 *U. S.* 510, 88 *S. Ct.* 1770, 20 *L. Ed. 2d* 776 (1968), to a case where a jury had not returned a death verdict. If defendant is arguing that a jury from which those opposed to capital punishment were excluded is "conviction prone," the negative answer to such an argument is to be found in *State v. Mathis*, 52 *N. J.* 238 (1968).

Affirmed.

*For affirmance* — Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN — 7.

*For reversal* — None.