THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. FRED WARD, Defendant-Appellant.

(No. 58948;

First District (4th Division)—May 22, 1974.

Paul Bradley, Kenneth L. Jones, and Margaret Maxwell, of State Appellate Defender's Office, of Chicago, for appellant.

Bernard Carey, State's Attorney, of Chicago (Patrick T. Driscoll, Jr. and Edward J. Ozog, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE JOHNSON delivered the opinion of the court:

The defendant, Fred Ward, was charged by indictment with the murder of Thomas Brown, age 14. In a bench trial, he was found guilty and sentenced to a term of 14 to 22 years in the penitentiary.

On appeal, defendant presents the following issues for review:

(1) Whether the finding that he was sane at the time of the offense should be set aside;

(2) Whether a psychiatric report which gave an opinion of the defendant's sanity was properly admitted into evidence;

(3) Whether the trial court erred in excluding testimony offered by the defendant to support his defense of insanity.

At trial, Otis Diggins and Cornelius Wright were called by the State to testify concerning the incident which led to defendant's arrest. The testimony of both witnesses was identical in all material respects and

may be summarized as follows. At approximately 3 P.M. on March 18, 1970, Diggins and Wright were walking down 44th Street when they saw a man, later identified as Fred Ward. Diggins testified that when Ward was about 20 feet away from them, he saw defendant pick up a stick from a yard. According to Diggins, Ward continued to advance toward them, grabbed him by the collar and asked if he were a member of "P Stone." When Diggins replied that he was not, defendant tried to hit him. The witness avoided the blow and ran away.

Cornelius Wright testified that he was walking with Diggins after school on March 18, 1970, when he saw the defendant fighting with Eric Weatherspoon on 44th Street. When the fight ended, Diggins and Wright continued walking in that direction. According to Wright, defendant then picked up a one-by-one club and approached Diggins. Defendant grabbed Diggins by the collar and asked whether he was a member of the "Black Stones." Diggins answered "no" and, after a moment, defendant turned and swung at Wright with the stick.

Both Diggins and Wright testified that defendant then walked down the street, approached another young boy and struck him with the stick. Wright testified that defendant then crossed the street and attempted to strike another young boy. Diggins watched defendant cross from side to side of the street, hitting people on the head. Defendant then approached the deceased, Thomas Brown. Brown was standing on the street with a girl. Defendant struck Brown on the head. When Brown fell to the ground, defendant hit him three or four more times and then walked away. Neither Diggins nor Wright heard defendant say anything to Brown.

The defense attempted to ask Otis Diggins if it appeared to him that defendant was acting as if he were "crazy." The court, however, sustained the State's objection to the question.

Diggins and Wright testified that they helped get Thomas Brown to the hospital. Simon Brown, the father of the deceased, testified that he received a call from the hospital that Thomas was dead. Brown testified further that his son, Thomas, was 14 years old and a high school student at the time of the occurrence.

Mrs. Mamie Ward, the defendant's mother, testified on his behalf. She stated that the defendant was the oldest of five children and that he lived with her at the time of the offense. Mrs. Ward testified further that Fred "did not have a father" but had been close to his maternal grandfather. When defendant was 4 years old, his grandfather died. According to Mrs. Ward, Fred would look for his grandfather at night and run off calling his name.

Mrs. Ward testified further that Fred never had any friends and would

not play with his brothers and sisters. He preferred to stay in his room alone. Sometimes he had temper tantrums and would not talk to his mother. Mrs. Ward stated that when Fred was about 5 years old, he began to have seizures during which he would break out, foam at the mouth, and turn "real white." The seizures lasted 2 or 3 minutes, and occurred about twice a month. According to Mrs. Ward, Fred's last seizure occurred in 1963.

Mrs. Ward stated that Fred was sent to the Audy Home for "ditching school" in 1962 or 1963. Subsequently, he was transferred to St. Charles and to Chester for reasons she did not know. When Fred returned from Chester in 1967, a doctor told Mrs. Ward that he may have suffered a nervous breakdown and would have to receive electric shock treatments.

The defense then called Dr. Jeffrey Garfield, a clinical psychologist. Dr. Garfield testified that he administered the verbal section of the Wechsler Adult Intelligence Test (WAIT) to the defendant on June 25, 1970, and found him to have an IQ of 69. According to Dr. Garfield, the defendant exhibited signs of basic mistrust, inability to relate significantly and to manage his affairs. Based upon observation of defendant and a history later received from defendant's mother, Dr. Garfield concluded that Fred did not know the difference between right and wrong. The doctor diagnosed defendant's condition as a chronic paranoid schizophrenic who was also mentally defective.

The defendant, Fred Ward, took the witness stand in his own behalf. He testified that he was born in Tennessee on June 14, 1949, and that his attorney in the present case was Michael A. Unger. Defendant stated that he had talked to Mr. Unger about taking the stand, and he knew that he would testify in his own behalf although he did not know what questions would be asked. He denied hitting the deceased over the head with a board, indicating that he had been at home on the day of the occurrence. He stated that he completed eighth grade, indicating that school was "alright." Ward testified further that he was in the County Jail for about 32 months and had been in jail three previous times, twice for armed robbery and once for robbery.

In rebuttal, the State called Dr. Edward J. Kelleher, director of the Psychiatric Institute of the Circuit Court of Cook County, who examined the defendant on September 22, 1971. Dr. Kelleher reported that defendant's score on the WAIT was 75, which indicates an individual of "borderline" intelligence. Because of defendant's history of epileptic seizures, he was given an electro-encephalogram (EEG). The EEG showed an absence of brain damage.

According to Dr. Kelleher, the defendant exhibited no signs of mental illness. The doctor stated that defendant responded to his questions and

was in touch with reality. When asked about the circumstances which led to his arrest, the defendant stated that there was a fight and a young fellow was killed wih a stick or a club. Defendant denied committing the offense, stating that a friend of his did it. Based upon the examination of defendant and a review of his history, Dr. Kelleher concluded that defendant was competent to stand trial because he fully understood the nature of the charges pending against him and was able to cooperate with his counsel.

Dr. Kelleher testified further that he supervised a prior examination of defendant made by Dr. Robert A. Reifman, the assistant director of the psychiatric institute. Over defense objections, the court permitted Dr. Kelleher to read the report of Dr. Reifman. It indicated that, in Dr. Reifman's opinion, defendant was legally sane at the time of the offense.

On appeal, defendant contends that the State did not prove beyond a reasonable doubt that he was sane at the time of the offense. He argues that the evidence presented by the defense was convincing proof of insanity and was not overcome by the State's presentation of a psychiatric report to the contrary.

■■ A person is not criminally responsible for conduct if at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law. (Ill. Rev. Stat. 1971, ch. 38, par. 6—2.) Once evidence of insanity is introduced, the ordinary presumption of sanity does not prevail and the burden devolves on the State to prove that the accused was sane at the time of committing the act. *People v. Le May* (1966), 35 Ill.2d 208, 211, 220 N.E.2d 184, 186; *People v. Count* (1969), 106 Ill.App.2d 258, 262, 246 N.E.2d 91, 93.

In the instant case, the evidence of insanity consisted of the bizarre nature of the crime itself, testimony of defendant's mother concerning his past history, and the testimony of a psychologist who examined the defendant three months after the offense was committed. In rebuttal, the State presented testimony concerning the contents of a psychiatric report which concluded that defendant was legally sane at the time of the offense. The trial court, in finding defendant guilty of murder, concluded that defendant was sane at the time of the offense.

The determination of the defendant's mental condition at the time of an offense is a question of fact to be determined by the trier of fact. (*People v. Ford* (1968), 39 Ill.2d 318, 320, 235 N.E.2d 576, 578.) Its finding will not be disturbed on review unless it indicates passion or prejudice. *People v. Ford* (1968), 39 Ill.2d 318, 321, 235 N.E.2d 576, 578; *People v. Lassiter* (1971), 133 Ill.App.2d 353, 356, 273 N.E.2d 166, 168.

■■ We feel that the evidence in this case was sufficient to support the

trial court's finding that defendant was sane at the time of the occurrence. The State presented evidence attesting to his sanity although defense witnesses testified to the contrary. The resolution of the contradictory testimony and the determination of the weight and credibility of such testimony was for the trier of fact to decide. (*People v. Count* (1969), 106 Ill.App.2d 258, 263, 246 N.E.2d 91, 94.) The trial court observed the demeanor and behavior of all of the witnesses, including the defendant who testified in his own behalf. In our judgment, there is sufficient evidence in the record to support the trial judge's finding that defendant was sane at the time of the offense.

Secondly, defendant contends that he was denied his constitutional right to cross-examine a witness when the report of an examining psychiatrist who was not called to testify was admitted. The report to which defendant refers was written by Dr. Robert A. Reifman, assistant director of the Psychiatric Institute, under the supervision of the director, Dr. Edward J. Kelleher. Dr. Reifman examined the defendant and found him sane at the time of the offense. At trial, the court permitted Dr. Kelleher to state the opinion expressed by Dr. Reifman in the report that defendant was sane at the time of the offense. Since Dr. Reifman was not himself called as a witness, defendant contends he was denied his constitutional right to cross-exaimne Dr. Reifman as to the report.

■■ In our opinion, the defendant was not denied his constitutional right of confrontation. We believe that the report signed by Dr. Reifman was a staff report reflecting the official opinion of the Psychiatric Institute. Dr. Kelleher, as chief of staff of the Psychiatric Institute, appropriately testified regarding the official opinion rendered by his subordinates and at his direction. Since the report was made under the direction and supervision of Dr. Kelleher, he was fully capable of testifying to the matters in the report and was available for cross-examination on the report. A similar conclusion was reached by the Fifth Circuit Court of Appeals in *United States v. Davila-Nater* (1973), 474 F.2d 270, 283, wherein the court said:

> "* * * [A]lthough it is preferable for the doctor who examined the defendant to testify, a psychiatrist who has reviewed all of the records and attended a staff conference with the examining doctor is qualified to give his opinion as to whether the defendant was sane at the time of the commission of the crime."

The defendant relies principally upon *Mehochko v. Gold Seal Co.* (1966), 66 Ill.App.2d 54, 213 N.E.2d 581, where the court held it was error to permit a doctor to read the report of an independent laboratory into the record where the doctor's only knowledge of the test was through hearsay. We think that the facts in the instant case are clearly

distinguishable. In *Mehochko*, the report was prepared by an independent laboratory and the witness had no personal knowledge as to the matters it contained. Here, the report was prepared by a staff member of a psychiatric institute under the supervision and direction of the chief of staff. Thus, the chief of staff was fully capable of being cross-examined as to the matters contained in the report.

Finally, defendant contends that the trial court erred in excluding testimony offered by the defendant in support of his defense of insanity. He argues that defense counsel should have been permitted to ask an eyewitness his opinion of defendant's behavior at the time of the offense and that the trial court improperly limited the direct examination of the defendant.

At trial, Otis Diggins was called by the State to testify concerning the facts of the alleged offense. When defense counsel asked Diggins on cross-examination whether or not he thought defendant was "acting crazy" at the time of the offense, the trial court sustained an objection. The record shows, however, that the defense counsel did not attempt to clarify or rephrase the question.

■■ The general rule is that non-expert witnesses may give their opinion as to an individual's sanity based upon their personal observations. (*People v. Patlak* (1936), 363 Ill. 40, 1 N.E.2d 228; *People v. Williams* (1967), 38 Ill.2d 115, 230 N.E.2d 224.) However, the admission of lay opinion testimony as to the sanity of an accused is a question the trial judge must decide. (*People v. Wax* (1966), 75 Ill.App.2d 163, 220 N.E. 2d 600.) In this case, the lay witness was asked his opinion as to whether defendant was "acting like he was crazy." We believe that this question is ambiguous, imprecise, and necessarily calls for a vague answer. Further, it distorts the proper legal standard for determining the sanity of an accused at the time of committing an offense. Consequently, we find no error in the trial court's ruling that excluded this lay witness' opinion. See *People v. Williams* (1967), 38 Ill.2d 115, 123, 230 N.E.2d 224, 229.

The defendant's final contention is that the trial court deprived him of an opportunity to fully present his insanity defense by sustaining objections to the following questions posed to the defendant by his counsel:

"What do you think that are wrong for people to do?
What do you see yourself doing in the future?
How much is nine times eight?
Would you repeat these numbers to me, 3, 2, 4, 6, 8, 9, 10?
How do you feel about me as your lawyer?"

Defendant argues that these questions were relevant to his insanity at the time of the offense. The best evidence of mental condition, he argues, is the appearance and lucidity of the defendant himself. The

State contends that its objection was properly sustained because this line of questioning is self-serving, prejudicial, immaterial, and designed to portray defendant as a pathetic and intellectually inferior person.

■■ Only insanity at the time of the offense can excuse criminal responsibility. (*People v. Moriarity* (1942), 380 Ill. 148, 43 N.E.2d 977.) Testimony, to be relevant and material, must shed some direct light on this issue. In this case, defendant was asked questions regarding his mental condition at the time of trial. In our opinion, these inquiries were immaterial to the question of whether, at the time of the occurrence, he was suffering from a mental disease or defect. Thus, we find that the trial court properly sustained objections to these portions of defendant's testimony.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Affirmed.

ADESKO, P. J., and BURMAN, J., concur.