(No. 46819 )

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee,
v. FRED WARD, Appellant.

*Opinion filed September 26, 1975.*

Paul Bradley, First Deputy, Office of State Appellate Defender, of Chicago (Kenneth L. Jones, Assistant Defender and Margaret Maxwell (law student), of counsel), for appellant.

William J. Scott, Attorney General, of Springfield, and Bernard Carey, State's Attorney, of Chicago (James B.

560

Zagel and Jayne A. Carr, Assistant Attorneys General, of Chicago, and Laurence J. Bolon and Edward J. Ozog, Assistant State's Attorneys, of counsel), for appellee.

MR. JUSTICE KLUCZYNSKI delivered the opinion of the court:

Following a bench trial in the circuit court of Cook County defendant, Fred J. Ward, was convicted of murder and sentenced to the penitentiary for a term of 14 to 22 years. The appellate court affirmed (*People v. Ward* (1974), 19 Ill. App. 3d 833), and we granted defendant's petition for leave to appeal. Defendant contends that a medical report concluding that he was sane at the time of the offense was improperly admitted into evidence, thereby depriving him of his right to confront the doctor who compiled the report, and that his sanity at the time of the offense was not established beyond a reasonable doubt.

While defendant testified on his own behalf at trial that he did not commit the crime and was not even present, no contention is now raised concerning the sufficiency of the evidence that indicates his involvement. Therefore only a brief recitation of facts relating to the crime is necessary.

On March 18, 1970, at about 3 p.m., Otis Diggins and Cornelius Wright left Forrestville High School and were walking on 44th Street between Vincennes Avenue and King Drive in Chicago. They saw defendant engaged in an altercation with another youth. When the fight ended, defendant approached them carrying a 1-by-4 club which he had picked up. Defendant asked Diggins if the latter was a member of the "P Stone," and when Diggins said he was not, defendant tried to hit him, but Diggins pushed defendant's arm. Wright, however, was struck on the hand by the club. Defendant then proceeded to hit another youth. He subsequently crossed the street and assaulted others. Finally, he approached the 14-year-old victim, Thomas Brown, who was standing with a girl. Defendant

struck the victim, knocking him to the ground, and he hit the victim several more times. By stipulation it was established that the victim died from a traumatic cerebral laceration.

In response to the State's motion for pretrial discovery pursuant to Supreme Court Rule 413 (50 Ill.2d R. 413), defendant alleged alternative theories that he did not commit the offense; and that, if he did commit the offense, he was insane at the time.

To support his defense of insanity defendant's mother testified. She related the childhood history of defendant stating that he was subject to seizures when he was very young which caused him to foam at the mouth. These seizures occurred twice a month and lasted 2 or 3 minutes. She said that the last convulsion he experienced of which she was aware occurred in 1963.

In 1953 when defendant was 4 years old his grandfather died and defendant's mother said that defendant would leave home in an attempt to find him. His mother described him as a "loner" who did not communicate with his family. He also was "ditching" school, and he never had a job. She further detailed his involvement with juvenile authorities which apparently resulted in his being placed in custody for several months in 1963 and later for 3½ years in a facility at Chester, Illinois, until his release in 1967. During this latter period she claimed that she was informed defendant received "treatment for his nerves" which included "electric shock" and that defendant had suffered a nervous breakdown. Her testimony also established that defendant had completed eighth grade.

Dr. S. Jeffrey Garfield, a qualified clinical psychologist, was called by defendant. He had interviewed defendant for 1 hour in June, 1970, at the county jail, in order to form an opinion as to defendant's emotional condition and intellectual capacity. He described defendant as a mistrustful person, experiencing anxiety, who did not understand the reason for his being in custody. Dr.

Garfield administered the verbal portion of the Wechsler Adult Intelligence Scale, and he concluded that defendant had an I.Q. of 69, which would place him in the lower 1% of the population.

Dr. Garfield was of the opinion that defendant was a chronic paranoid schizophrenic. He defined a schizophrenic as an "individual who is completely unable to relate to reality and to people around him. He lives in a fictional world dealing with fictional issues." He was further of the opinion that defendant could not manage his affairs with ordinary prudence. This witness also equated the term "feeblemindedness" to one who would be considered mentally defective. His prognosis for treatment of defendant was unfavorable due to defendant's inability to enter into a therapeutic relationship because of his mental insufficiency.

Based on factors previously described, Dr. Garfield said that defendant lacked a basis to evaluate between right and wrong. In response to a hypothetical question concerning the commission of the crime, he described the actions of the killer as those of a psychotic.

On cross-examination Dr. Garfield testified that he was able to diagnose any psychological problem within 1 hour. He explained that he did not administer the Rorschach or Thematic Apperception tests because their validity had not been established. He said that the verbal test he administered to defendant was standardized and that the socio-economic background or racial heritage of the individual taking the examination would not vary the result because, as he stated, error cannot occur in a standardized intelligence test. The record then reflects that Dr. Garfield apparently expressed a conflicting opinion when he said people of different backgrounds "score differently on different kinds of tests" including the Wechsler examination.

Dr. Garfield conceded that he had not examined certain medical records pertaining to defendant, and he

classified defendant's I.Q. as within that category of an educable mentally handicapped (E.M.H.) individual. He further said that a test score could vary depending on the subjective determination of the party administering the test and the atmosphere under which it was administered but that the variation would be insignificant. Finally, he reiterated his diagnosis that defendant was schizophrenic as well as mentally deficient.

In rebuttal the State called Dr. Edward J. Kelleher, a psychiatrist and the director of the Psychiatric Institute of the Circuit Court of Cook County. This witness was a Fellow of the American Psychiatric Association, and the defense stipulated to his expertise.

On September 22, 1971, Dr. Kelleher had conducted a study of defendant's condition for 3 to 4 hours in order to determine his competency to stand trial. He was aware of defendant's prior epileptic seizures from information he obtained from a report given to a social worker by defendant's mother. He therefore supervised the administration of an electroencephalogram for defendant which failed to disclose any organic brain damage. A superficial neurological examination was also conducted, and it did not indicate any serious nervous disorder. On cross-examination he said that a pneumoencephalogram, requiring an injection of air into the central nervous system, was not given because this test had to be administered under "hospital conditions." The latter test was designed to disclose the presence of a brain tumor or scar as well as brain shrinkage or unusual spaces in the brain.

Dr. Kelleher also examined reports from other institutions. Test results compiled by Dr. Martin, a psychologist at the Psychiatric Institute, were also considered. These tests consisted of scores on the Rorschach and Thematic Apperception tests and the Wechsler Adult Intelligence Scale Examination. The latter test rated defendant as having an I.Q. of 75, which Dr. Kelleher classified as dull or "borderline intelligence" but not an indication of

564

mental retardation. "Borderline intelligence" was defined by Dr. Kelleher as an I.Q. between 68 and 85, which is not a feebleminded rating and which is not usually a criterion to commit an individual to a mental institution. Dr. Kelleher then interviewed defendant for 1 hour "in the usual question and answer interview and observation examination done by a psychiatrist." He concluded that defendant was not suffering from any mental illness and that he was in touch with reality at the time.

Dr. Kelleher further testified that in May, 1972, he "supervised" an examination conducted by Dr. Robert Reifman, a board-certified psychiatrist. Over defense objection a letter written to the trial judge by Dr. Reifman, which is now in dispute, was introduced and in substance read by Dr. Kelleher. The letter stated:

> "In response to your Honor's order, the undersigned psychiatrist on Wednesday May 17, 1972, examined the above defendant. As a result of the above examination this patient was found to be legally sane at the time of the alleged offense."

On cross-examination defense counsel questioned Dr. Kelleher on matters contained in the reports concerning defendant while he was in the other institutions. Particular reference was made to statements that defendant had "jumped" a guard and that he had a sociopathic personality. Dr. Kelleher said he took these matters into account in his evaluation and also the opinions of others in basing his final conclusion in this case. He also said that the circumstances of the killing would not reflect upon the intelligence of the party committing the crime. Defense counsel then asked,

> "Q. Now, is it your testimony that even though you are aware of Fred Ward's prior difficulties, prior propensities for violence, prior commitment to mental institutions, that he was not suffering from any—and knowing what his intelligence was, that he was not suffering from any mental defect when this crime was alleged to have taken place, is that right, yes or no?

> A. Not suffering from a mental disease. Defect, I just said he is not listed as a feebleminded person so if you have your definition of defect which differs from that, I don't know how else to answer it."

Finally, defense counsel urged that all of Dr. Kelleher's records be admitted into evidence and considered by the trial court.

In affirming defendant's conviction the appellate court found no error in the admission of Dr. Reifman's report. The appellate court, citing *United States v. Davila-Nater* (5th Cir. 1973), 474 F.2d 270, held that the admission of the report was proper because it reflected "the official opinion of the Psychiatric Institute. Dr. Kelleher, as chief of staff of the Psychiatric Institute, appropriately testified regarding the official opinion rendered by his subordinates and at his direction. Since the report was made under the direction and supervision of Dr. Kelleher, he was fully capable of testifying to the matters in the report and was available for cross-examination on the report." 19 Ill. App. 3d 833, 838.

Defendant argues that Dr. Kelleher's statement which recited Dr. Reifman's opinion that defendant was "legally sane" is an out-of-court statement offered to prove defendant was, in fact, sane and, as such, was impermissible hearsay. (See *People v. Carpenter* (1963), 28 Ill.2d 116, 121.) Defendant asserts that Dr. Kelleher did not adopt "the opinion of Dr. Reifman or give an opinion of his own that [defendant] *** was sane at the time of the offense. The source of the assertion was Dr. Reifman, whom the State never produced as a witness." It would appear that defendant has broadened his assertion when he also says that he was "denied confrontation with the person who performed the tests" upon which Dr. Reifman relied in reaching his conclusion on defendant's sanity.

An accused cannot be convicted of an offense, "if at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity either to

appreciate the criminality of his conduct or to conform his conduct to the requirements of law." (Ill. Rev. Stat. 1969, ch. 38, par. 6—2(a).) The terms "mental disease or mental defect" are not defined, but "an abnormality manifested only by repeated criminal or otherwise anti-social conduct" is expressly excluded from the purview of these terms. Ill. Rev. Stat. 1969, ch. 38, par. 6—2(b).

We must initially reject the position that Dr. Kelleher merely recited another's opinion as to defendant's sanity. It is clear from the record that Dr. Kelleher expressed his own opinion as to the fact defendant was not suffering from a mental disease at the time the crime was committed. He was of the further opinion that defendant, who was not feebleminded, did not have a mental defect. Dr. Kelleher was subject to thorough cross-examination on these matters.

Dr. Kelleher based his opinion, in part, upon the medical records compiled by others who did not testify and, as such, these records would normally not have been admitted into evidence (Ill. Rev. Stat. 1971, ch. 38, par. 115—5(c)(1); see also Supreme Court Rule 236(b)). Defense counsel, however, urged that these records be admitted, and it appears that the records contained Dr. Reifman's report. Under these circumstances there can be no error in the admissibility of Dr. Kelleher's testimony concerning defendant's sanity at the time of the crime. For a comparable reason in this case we are unable to accept defendant's complaint that he was deprived of the opportunity to confront the person who performed the tests upon which Dr. Reifman may have relied.

But even if these reports had not been admitted into evidence, there would not have been error in the propriety of Dr. Kelleher expressing his opinion as to defendant's sanity predicated, in part, upon these reports. Defendant has cited *People v. Black* (1937), 367 Ill. 209, wherein the court found error in the admission of expert medical opinion evidence as to the accused's sanity which was

partly based on records not admitted into evidence. However, we are cognizant of an increasing number of cases where the holdings would appear *contra* to *People v. Black.* In *United States v. Partin* (5th Cir. 1974), 493 F.2d 750, the court stated at page 764:

> "[A]lthough medical reports containing expert opinions as to sanity may not be admitted directly into evidence, they may be used by other experts in arriving at a conclusion as to an individual's sanity, upon which the expert is open to cross-examination as to the weight he gave the reports and why [citation]."

The desirability of allowing expert medical opinion as to sanity based, in part, on records not admitted into evidence is further buttressed by the newly enacted Federal Rules of Evidence. (28 U.S.C.A. Rule 101 *et seq.*) Rule 703 provides:

> "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. *If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.*" (Emphasis added.)

The advisory committee's note to this rule states:

> "The third source contemplated by the rule consists of presentation of data to the expert outside of court and other than by his own perception. In this respect the rule is designed to broaden the basis for expert opinions beyond that current in many jurisdictions and to bring the judicial practice into line with the practice of the experts themselves when not in court. Thus a physician in his own practice bases his diagnosis on information from numerous sources and of considerable variety, including statements by patients and relatives, reports and opinions from nurses, technicians and other doctors, hospital records, and X rays. Most of them are admissible in evidence, but only with the expenditure of substantial time in producing and examining various authenticating witnesses. The physician makes life-and-death decisions in

reliance upon them. His validation, expertly performed and subject to cross-examination, ought to suffice for judicial purposes." 28 U.S.C.A. Rule 703, at 503-04 (1975). See also 3 Weinstein's Evidence, at 703-8 to 703-11 (1975).

For these reasons we are of the opinion that insofar as *People v. Black* applies to the admission of expert medical opinion as to an accused's sanity based, in part, on medical or psychological records compiled by others which are not admitted into evidence, that decision is no longer to be given effect. If such reports are of a type customarily utilized by the medical profession, then these reports may be used as factors by an expert in the determination of his opinion as to an accused's sanity even though the reports are not admitted into evidence. The restriction that these materials be commonly used by the medical profession attributes a high degree of reliability to them. *People v. Sugden* (1974), 35 N.Y.2d 453, 323 N.E.2d 169; *Smith v. State* (Ind. 1972), 285 N.E.2d 275, *cert. denied,* 409 U.S. 1129; Annot., 55 A.L.R.3d 551 (1974).

Finally, defendant has argued that he was not proved sane beyond a reasonable doubt. The record presents a question of fact to be determined by the trial court. Its decision will not be reversed unless the determination is so improbable or unsatisfactory as to raise a reasonable doubt as to defendant's sanity. (See *People v. Curry* (1973), 56 Ill.2d 162, 174.) While defendant's criminal conduct seems bizarre, this does not necessarily indicate that the defendant was insane. (See *People v. Redmond* (1974), 59 Ill.2d 328, 339.) Having considered the record, we find the trial court properly held that defendant was sane at the time he committed the offense.

The judgment of the appellate court is affirmed.

*Judgment affirmed.*