THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* DON CHARLES MEEKER, Defendant-Appellant.

Fifth District    No. 79-219

Opinion filed July 8, 1980.

John H. Reid and E. William Hutton, both of State Appellate Defender's Office, of Mt. Vernon, for appellant.

Lawrence Eaton, State's Attorney, of Newton (Martin N. Ashley, of State's Attorneys Appellate Service Commission, of counsel), for the People.

Mr. PRESIDING JUSTICE JONES delivered the opinion of the court:

Defendant, Don Charles Meeker, was charged by information with arson and burglary (Ill. Rev. Stat. 1977, ch. 38, pars. 19—1, 20—1), involving the destruction by fire of the Hidalgo Independent Christian Church, Hidalgo, Illinois. Following a jury trial in the circuit court of Jasper County defendant was convicted on both counts and sentenced to a single term of six years imprisonment. On appeal he raises three issues: (1) whether he was proved sane beyond a reasonable doubt; (2) whether the trial court's refusal of defendant's tendered jury instruction regarding the consequences of a verdict of not guilty by reason of insanity caused the jury to convict him because they believed he would be set free otherwise; and (3) whether defendant's burglary conviction must fail for lack of proof that his entry into the church was unauthorized.

First, we consider whether defendant was proved sane beyond a reasonable doubt. A person is not criminally responsible for conduct by reason of insanity if at the time of such conduct, as a result of mental disease or mental defect, he lacks substantial capacity either to appreciate the criminality of his conduct or to conform his conduct to the requirements of law. (Ill. Rev. Stat. 1977, ch. 38, pars. 6—2(a), 1005—1—11.) This is, to say the least, a "vexed question," (Ill. Ann. Stat., ch. 38, par. 6—2, Committee Comments, at 326 (Smith-Hurd 1972)), and each case must necessarily be decided on its own facts and circumstances. (*United States v. McCracken* (5th Cir. 1974), 488 F.2d 406.) What follows below is defendant's version of the church fire and the events leading up to it summarized from his testimony at trial and a lengthy statement he gave to

an arson investigator several hours after the fire. The statement was tape recorded and was played to the jury at trial.

The idea of burning down the church first came to defendant while he was speaking to his mental health counselor at Carbondale. Days later, after walking on the campus of Washington University in St. Louis, he decided that if he was ever to return to college or lead a normal life he would have to "deal with the incest that hangs over my life." He bought four five-gallon gasoline cans and three screwdrivers (to be used to force entry to the church) at a Central Hardware Store on Lindberg Avenue in St. Louis. That night at a St. Louis filling station he had an attendant fill the cans without removing them from the trunk of his car. Some gas spilled in the trunk. Defendant was concerned that he could not smoke cigars with the trunk open; he placed a wetted "cover" over the cans to deaden gasoline fumes. Driving toward Hidalgo he stopped in Vandalia at about 1:15 a.m. and refuelled his car, spending $9. He stopped at a "76" truck stop in Effingham where he ate a butter roll with coffee and orange juice. When he reached Hidalgo he parked the car behind an evergreen tree west of the church. He took a 10-minute walk, smoking his pipe. Then he entered the church. The door was not locked. He poured out all four cans of gasoline at the wall that separated the sanctuary from the other half of the church, intending for that entire structure to be destroyed. He poured a gasoline trail to the center of the sanctuary and lit it with a yellow lighter ("colors of Communism"). There was an explosion which surrounded him with flames and blew out the church windows and doors. He drove to the county jail at Newton where he removed from his car his luggage packed with tobacco and other items for his stay at the jail. He parked his car across the square and waited there to give the church time to burn. When he saw a fire truck leave he returned to the jail and told the sheriff he had set fire to the church.

Defendant explained at length the events over several years which led to the church fire. When he was 16 years old three well-respected neighbors saw him in bed with his sister. Both were unclothed but they were not touching. He felt he had had "that incest hanging over me ever since." He felt a consequent hostility in the community prevented him from living a normal life. This caused him to set four or five fires, each of which, he felt, had helped to alleviate his problem relating to incest.

Defendant stated he had spent the last seven years in and out of mental hospitals. He called the medications forced on him there "torture." The drugs caused him intense sexual fantasies such as homosexual promiscuity and·severing his penis. He knew each fire would bring commitment to a hospital and more drug "torture." He perceived three possible results from burning the church. First, since he was on probation

he might be sent to the prison farm at Vandalia. Second, he might be sent to the State mental hospital at Chester. Third, he might get his version of the incest story publicized—a goal he continually emphasized. He thought the possible prison sentence for arson was one to 20 years and that a sentence of five to 10 years was quite possible. If convicted he expected to be placed in the psychiatric ward at Menard, a result he greatly feared. He did expect the church fire to cause some shift in community attitude regarding the incest as he perceived each previous fire had done.

According to defendant, about two months before the near-incest, his father started "beating my mother insane." She had been in and out of mental institutions since then and was under heavy medication.

Defendant stated his high school record was very good—"straight A"—and that he wanted to go to a good college. His father insisted he go to Eastern Illinois University, an alternative defendant found unacceptable. In 1965, "as a kind of call for help," he set fire to his father's warehouse and shot himself in the shoulder with a .22-caliber rifle. "And by that I did get myself a college education." After a stay at Renard mental hospital in St. Louis he attended Washington University for three years. He achieved straight A's his freshman year and a B average in his sophomore year because of extracurricular activities. In the third year "my incest started catching up with me." He left college in 1970, going to live in a farmhouse owned by his father. In 1971 he set that house on fire "with a heavy atmosphere of incest hanging around * * *." He spent the next three months in two mental hospitals, Renard and St. Vincent's. After he returned home his brother told him that one Mick Healey had said defendant and his sister had had mutual oral-genital contact. Defendant shot Healey's house windows out with a shotgun, aiming high to avoid the occupants. On the way he shot his own family's dog. Defendant spent the next seven months in the Alton State mental hospital. While there he cut his wrists. After his return home he took $1200 from his father and drove to San Diego where he lived in his car. When he ran out of money he returned home where he was injured in an automobile accident. He was taken to a hospital. He left wearing Bermuda shorts and a small blanket. The police found him and took him to jail ("I must have looked a bit off"). He was placed in the State mental hospital at Anna for 13 months, his stay ending in 1974. When he came home he spent one month in a shelter-care home. He thought senior citizens there were deliberately trying to annoy him. He found the place intolerable and in 1975 burned down his family's residence. A criminal prosecution was initiated. He was found unfit to stand trial with the result that he was committed to the State mental hospital at Chester for 13 months and Anna for six months. In February

1977 he pleaded guilty to arson regarding the 1975 fire and was sentenced to three years probation. He moved to Carbondale where he attended a mental health clinic until just before the church fire.

During defendant's 13-month stay at Chester he was advised to get his version of the incest story out into the community and see whether anyone believed him. When he was released he asked the Jasper County State's Attorney for a trial for incest. He was refused. He also called the Attorney General's office in Springfield, Illinois, in an attempt to get an incest trial. He was again refused. He asked the pastor of the church to let him tell his version of the incest story before the congregation. He was refused. He stated in his taped statement: "In other words, he sort of sentenced me to be damned for the rest of your life. And so, as a symbolic gesture, I set fire to the church last night."

At trial defendant testified he "had to" set the church fire to get his version of the incest story out in the open. He did not want to go to a mental institution, "but I don't know of any other way to have dealt with the problem." He knew it was unlawful to burn down a church. Questioned why, with his awareness of the law and consequences, he set fire to the church, he testified, "I felt I didn't have any choice." When he decided while in St. Louis that the time had come to set the church fire he went to bed for two days. When he awoke the day before the fire he packed a suitcase and a duffel bag "full of stuff I would need in the county jail," including clothing, shampoo, toothpaste, tobacco and cigars.

Samuel Nick Carter, a Jasper County sheriff's deputy, testified he received a call that the church was burning at 3:58 a.m. About 4:30 he saw defendant leave his luggage on the ground near the jail building. Defendant stated in response to Carter's shouted question that he would probably be moving in with him. Later, defendant returned, picked up his bags, carried them inside the jail, and stated he had burned the church. Sheriff Mulvey's testimony regarding defendant's two visits to the jail corroborated that of his deputy.

Helen Meeker, defendant's aunt, testified regarding defendant's long history of mental illness. She related numerous incidents from defendant's past of an eccentric or bizarre nature. She stated that during arguments between defendant and his father regarding defendant's college choice defendant received head injuries when he was pushed through a glass door. She testified that after defendant burned down the farmhouse he told her he had wanted a different heater and that the one he had had there was not pleasing to him. She testified defendant's mother and one sister had had mental treatment.

Two expert witnesses testified at trial regarding defendant's mental condition. Dale Sunderland testified for defendant. He testified he had practiced psychiatry, his specialty, since 1967. He was not certified by the

American Board of Psychiatry. He had examined defendant for about 40 minutes two weeks before trial to determine whether he was sane when he set the church fire. Defendant wanted to tell his story in open court—not about the fire but about the incest. Sunderland classified defendant's disorder as schizophrenia, either chronic or differentiated type. He found defendant exhibited poor judgment, poor logic, and bad insight, and had difficulty conforming to society and reality. In Sunderland's opinion, at the time of the fire, defendant could not appreciate the criminality of his actions and could not conform his actions to that area of the law. Sunderland was sure defendant knew burning a building was unlawful. Sunderland stated that despite that awareness defendant was capable of deluding himself and rationalizing his unlawful action. The State's Attorney asked Sunderland to assume defendant told him that if a State trooper had come by when he was preparing to burn the church, he would not have burned it. Sunderland responded that even if defendant made such a statement, it did not show defendant would have waited had a trooper passed by.

Edward Rowan testified for the State in rebuttal as an expert witness. A practicing psychiatrist since 1967, he was certified by the American Board of Psychiatry and Neurology. He had examined defendant for an hour and 20 minutes about five weeks before trial. He agreed with Sunderland that defendant's affliction was a form of schizophrenia, though he differed as to type. In his opinion, defendant at the time of the church fire was able to appreciate the criminal nature of his conduct. Rowan cited the fact that defendant packed his luggage and expected to go to jail, conduct which showed that defendant knew the act was wrong and expected to be arrested for it. Rowan was also of the opinion that at the time defendant burned the church he was able to conform his conduct to the requirements of the law. Rowan noted in this regard defendant's answer to Rowan's question as to what defendant would have done if a deputy sheriff or someone else had come along while he was pouring the gasoline. Defendant answered that if someone had come along he would not have done it, that he would have waited until the "coast was clear." Dr. Rowan also stated that mental illness in a medical sense did not necessarily prevent a person from being able to appreciate the criminality of his conduct and to conform his conduct to the requirements of law. Rowan was of the opinion, though, that the type of mental disorder suffered by defendant could prevent a person from appreciating the criminality of his conduct and conforming his action to the law.

■■ Once evidence of insanity is introduced, the ordinary presumption of sanity does not prevail and the State must then prove beyond a reasonable doubt that the accused was sane when he committed the act in question. (*People v. Ward* (1974), 19 Ill. App. 3d 833, 313 N.E.2d 314, *aff'd* (1975),

61 Ill. 2d 559, 338 N.E.2d 171; *People v. Gold* (1967), 38 Ill. 2d 510, 232 N.E.2d 702.) Only insanity at the time of the offense can excuse criminal responsibility. (*People v. Ward.*) Although the accused understood the nature of his conduct and appreciated its wrongfulness he will be excused from criminal liability if his ability to consciously refrain from the conduct was substantially impaired by a mental defect. (*People v. Spears* (1978), 63 Ill. App. 3d 510, 380 N.E.2d 423.) The question of defendant's sanity at the time of the offense is a question of fact for the jury, and the jury's finding on the issue of insanity will not be disturbed unless it is so manifestly against the weight of the evidence as to indicate the verdict was based on passion or prejudice, or unless the evidence raises a reasonable doubt of defendant's sanity. (*People v. Spears*; *People v. Rockamann* (1979), 79 Ill. App. 3d 575, 399 N.E.2d 162; see *People v. Foster* (1979), 76 Ill. 2d 365, 392 N.E.2d 6.) The trier of fact may consider defendant's statements as well as the physical evidence and other facts in evidence. (*People v. Burress* (1971), 1 Ill. App. 3d 17, 272 N.E.2d 390.) It has been recognized that one fact of particular relevance to a defendant's sanity is the existence of a plan or design for the crime. *People v. Burress*; *People v. Spears.*

● 2 We find the evidence amply supported the jury's conclusion that defendant was sane at the time of the instant offense. Defendant was certainly insane in a medical sense when he set the church fire. His expressed motive and his packing luggage for a jail stay were bizarre, as was his immediate surrender. The fact that the offense was bizarre does not compel a finding that defendant was not legally sane when the crime was committed. (*People v. Ward* (1975), 61 Ill. 2d 559, 338 N.E.2d 171.) Defendant's appreciation of the criminal nature of his conduct is shown by his preparations for and expectation of imprisonment, his immediate surrender, the early morning hour he chose to set the fire ensuring lack of detection, his statement to Dr. Rowan that he would have waited if a deputy had passed by, and his express admissions that he knew burning any building was unlawful.

It is not enough that the defendant be able to distinguish right from wrong; he must also be capable of exercising the power to choose between them. (*People v. Lowhone* (1920), 292 Ill. 32, 126 N.E. 620; Ill. Ann. Stat., ch. 38, par. 6—2, Committee Comments, at 327 (Smith-Hurd 1972).) The evidence here sufficiently indicates defendant was able to choose between a lawful course of conduct and an unlawful one at the time in question. Significant in this regard is defendant's statement to Dr. Rowan that he would have waited if a deputy had passed by (see *People v. Romaine* (1979), 79 Ill. App. 3d 1089, 399 N.E.2d 319), his tape-recorded statement demonstrating how he weighed the consequences of the offense against his inability to tell his version of the near-incest, his

premeditation of the offense over a period of days, his extensive planning for the offense and incarceration and the existence of a possible motive for revenge stemming from the pastor's refusal to allow defendant to address the church congregation. These facts substantially demonstrate that the offense at bar was the product of lengthy consideration, not what defendant characterized as an irresistible impulse.

Dr. Sunderland's opinion that defendant was legally insane at the time in question does not require that we disturb the jury's verdicts. The weight to be accorded psychiatric testimony is for the trier of fact. (*People v. Burress.*) The weight of an expert's opinion is measured by the reasons given for the conclusion and the factual details which he marshals in support of it. (*People v. Burress; People v. Spears.*) Resolution of contradictory testimony and determination of its weight and credibility are for the trier of fact. (*People v. Ward* (1974), 19 Ill. App. 3d 833, 313 N.E.2d 314.) It is within the discretion of the trier of fact to accept one expert's opinion over another's. (*People v. Rockamann.*) Dr. Rowan's opinion that defendant was legally sane when he set the fire was based in part on defendant's preparations prior to the fire for a stay in jail and defendant's statement to Rowan that he would have waited if a deputy had passed by. Dr. Sunderland simply discounted the significance of defendant's statement to Rowan. Also, Sunderland's opinion that defendant was not capable of appreciating the criminality of his acts was undercut when Sunderland stated defendant knew burning a building was unlawful. Thus there appears ample basis for the jury's discounting of Dr. Sunderland's opinion in favor of Dr. Rowan's.

Defendant's next contention is based on the trial court's refusal of defendant's tendered jury instruction regarding the consequences of a verdict of not guilty by reason of insanity. The State argues that the jury should not be instructed as to possible consequences of such a verdict, and that, even if such an instruction were appropriate, the one tendered here was inadequate. Defendant maintains he might well have been found not guilty by reason of insanity if the jury had been instructed regarding the consequences of such a verdict. In the absence of such an instruction he urges the jury incorrectly assumed such a verdict would result in defendant's release and found him guilty because they perceived that was the only way to remove him from society.

The non-IPI Criminal instruction tendered by defendant and refused by the trial court is as follows:

> "If the defendant is found not guilty by reason of insanity, a hearing shall be held pursuant to Illinois statute to determine whether the defendant is in need of mental·treatment."

The record on appeal does not contain the transcript of the conference on jury instructions.

We have found no Illinois authority dealing directly with the question of the trial court's refusal of a tendered instruction regarding the consequences of a verdict of not guilty by reason of insanity. In *People v. Smith* (1976), 41 Ill. App. 3d 776, 354 N.E.2d 546, the court held it was not reversible error to fail to give such an instruction where none was tendered. The court declined to consider whether it would be error to refuse such an instruction when tendered. However, the issue has been considered in many other jurisdictions, several of which were mentioned, with citations, by the parties at bar. The vast majority do not permit such an instruction because of the general rule that the jury is to consider only its verdict and not the consequences thereof. *E.g., State v. Park* (1963), 159 Me. 328, 193 A.2d 1.

We decline to adopt as a general rule of law a requirement that the jury be given an instruction which relates the consequences of a verdict of not guilty by reason of insanity. Such an instruction would inject into the trial and the deliberations of the jury extraneous and irrelevant matters that would have no bearing on defendant's guilt or innocence. The reason for such a rule urged by defendant, that knowledge of the consequences of such a verdict would prevent the jury from finding a legally insane defendant guilty because he is too dangerous to release, has been successfully urged elsewhere. (See *Commonwealth v. Mutina* (1975), 366 Mass. 810, 323 N.E.2d 294.) But in our view the reasons for refusing such instructions are more persuasive. The jury's verdict should not be influenced by its possible consequences. (*State v. Conforti* (1969), 53 N.J. 239, 250 A.2d 6.) Such an instruction invites the jury to reach a compromise verdict, finding defendant not guilty by reason of insanity despite clear evidence of legal sanity because defendant will be incarcerated anyway. (*State v. Holmquist* (1977), 173 Conn. 140, 376 A.2d 1111; *State v. Garrett* (Mo. 1965), 391 S.W.2d 235; *People v. Adams* (1970), 26 N.Y.2d 129, 309 N.Y.S.2d 145, 257 N.E.2d 610.) Where the defendant's commission of the act in question and his criminal responsibility are both closely disputed, such an instruction may also tempt the jury to compromise by finding the defendant not guilty by reason of insanity. (*Commonwealth v. Mutina* (Quirico, J., dissenting).) It does not appear that requiring such an instruction in all cases involving an insanity defense, or even in close cases, would help the jury reach a true and correct verdict.

Even if we perceived a general need for such an instruction as we discuss, it does not appear the one tendered here by defendant would clear any misconception that defendant might go free after a verdict of not guilty by reason of insanity. In Illinois a defendant found not guilty by reason of insanity is not necessarily committed for mental treatment

following the verdict. (See *Lyles v. United States* (D.C. Cir. 1957), 254 F.2d 725; *United States v. Greene* (7th Cir. 1974), 497 F.2d 1068; compare 24 U.S.C. §211 (1976), with Ill. Rev. Stat., 1977 Supp., ch. 38, par. 1005— 2—4.) If defendant is committed, the length of his commitment is uncertain. Incarceration for treatment after a verdict of not guilty by reason of insanity is at least a possibility and at most a likelihood. The Illinois statute presents a major obstacle to formulation of an instruction concerning consequences. If the instruction tendered here were given it would still appear the jury could prevent defendant's release only by finding him guilty. It appears, as defendant claims, that the instruction tendered is not inconsistent with the Illinois statute. However, we find the instruction so uncertain regarding the possibility of post-verdict confinement that it would not benefit defendant if it were given.

■■ We do not decide whether special circumstances in a given case might warrant giving an instruction on the consequences of a verdict of not guilty by reason of insanity. The court in *Malo v. State* (1977), 266 Ind. 157, 361 N.E.2d 1201, recognized such a circumstance where the prosecutor has argued to the jury that defendant will be set free if found not guilty by reason of insanity. No special circumstances appear here and the trial court did not err in refusing the instant instruction. Defendant's conviction of arson is accordingly affirmed.

The sole remaining issue on appeal affects only defendant's burglary conviction. Defendant urges the proof adduced by the State was insufficient with respect to one essential element of the offense of burglary, *i.e.*, that defendant entered the church without authority. Ill. Rev. Stat. 1977, ch. 38, par. 19—1(a).

The sole witness called by the State to prove that defendant's entry into the church was unauthorized was Fred Carr, treasurer of the Hidalgo Independent Christian Church. He had held that office for 10 years and had been a member since age 13. He classified defendant as an "inactive member" who had not been active for several years. He estimated on cross-examination that the church had about 120 "members," including inactive members and 65 to 70 who attended regularly. The church had no pastor at the time of the fire. Carr stated there was no express rule prohibiting burning the church; he believed it was understood. Defense counsel's cross-examination of Carr continued as follows:

"Q. Is your church open to people who don't belong to the Hidalgo Independent Christian Church?

A. Yes.

Q. I mean can people enter the building, itself?

A. Visitors are welcome at any time.

Q. At any time, does that mean twenty-four hours?

A. During services.

Q. Are members, not visitors, members allowed to go into the church at any time?

A. Yes.

Q. So, you have an open-door policy at your church?

A. Yes."

There was no other evidence tending to show defendant's entry was unauthorized. We find the evidence insufficient to sustain the State's burden on that issue. Carr's testimony unequivocally classed defendant as a "member," albeit inactive. The church maintained an open-door policy with respect to "members." There was no testimony limiting defendant's authority to enter as a member of the congregation, either as to time or purpose of entry. We do not deem it appropriate to assume that entry between 1 a.m. and 4 a.m. was prohibited to members, in view of Carr's testimony. In that regard we note defendant's uncontradicted testimony that the door was unlocked, tending to show the church's policy was indeed open-door.

■■ We do not conclude that burglary of a church by one of its members is not possible and cannot be proved. Our holding is limited to the testimony adduced in this case, which we find insufficient to sustain the State's burden of proof beyond a reasonable doubt.

The State, citing his "inactive" status, urges that the proof showed defendant was not a member of the church, that he met the pastor only once, and that defendant's testimony "indicates absolutely no spiritual affinity with the teachings of the Church or its purpose for existence." However, the testimony of Fred Carr showed only that defendant was a member. There was no indication that he was accorded lesser privileges of entry than those of the members in regular attendance. No act appears on defendant's part sufficient to terminate unilaterally defendant's authority to enter, and no testimony appears with regard to termination of membership by the church through its officers or its members.

■■ The State argues that defendant was clearly not authorized to enter the church for the purpose of burning it down. Accordingly, we are urged to apply the principle that "authority to enter a business building or other building open to the public extends only to those who enter with a purpose consistent with the reason the building is open" and that an entry into such a building with intent to commit a felony or theft cannot be said to be within the authority granted those who might enter. (*People v. Baker* (1978), 59 Ill. App. 3d 100, 102, 375 N.E.2d 176, 178.) The State urges defendant's entry was for a purpose inconsistent with the purposes for which the building was open to the public. According to Mr. Carr, the building was not open to the public for any purpose other than attending services. Defendant was, Mr. Carr stated, accorded greater privileges of

access than a mere member of the public. In view of this testimony we find the principle in *People v. Baker* inapplicable to the facts proved here.

■■ In view of our determination that defendant's burglary conviction must fail for lack of evidence that the entry was unauthorized, defendant asks that the cause be remanded for resentencing on the arson conviction. In cases where a defendant's conviction is reversed on appeal as to certain counts for insufficient evidence of guilt and affirmed as to other counts, precedent exists for remanding the cause for resentencing on the counts affirmed. (*People v. Vallero* (1978), 61 Ill. App. 3d 413, 378 N.E.2d 549.) We note defendant was sentenced to a single term of six years imprisonment. Defendant could have been sentenced to a term of up to seven years for arson, a Class 2 felony. (Ill. Rev. Stat., 1977 Supp., ch. 38, par. 1005—8—1(a)(5).) While the trial court declined to sentence defendant under extended term provisions, it could have done so in view of defendant's prior arson conviction. (Ill. Rev. Stat., 1977 Supp., ch. 38, par. 1005—5—3.2(b)(1).) Thus a term of seven to 14 years was possible. (Ill. Rev. Stat., 1977 Supp., ch. 38, par. 1005—8—2(a)(4).) On this record the sentence imposed was certainly warranted. We find no indication in the comments of the trial court at sentencing suggesting a lower sentence would have been imposed had defendant been convicted only of arson. Rather, the court's comments reflect he was concerned primarily with the arson, and he imposed but a single sentence. The sentence imposed was well within the statutory limits for conviction of arson and was fully justified by the factors to be considered in imposing sentence. We find no substantial possibility that the trial court's single sentence was influenced by the existence of the burglary conviction and, accordingly, defendant's sentence on the arson conviction is affirmed.

Affirmed in part; reversed in part.

SPOMER and WHITE, JJ., concur.