PAMELA WRIGHT, a Minor, by Thelma Wright, Her Mother and Next Friend, Plaintiff-Appellant, *v.* YELLOW CAB COMPANY *et al.*, Defendants-Appellees.

First District (5th Division) No. 81—1760

Opinion filed June 30, 1983.

William J. Larned, of Chicago, for appellant.

Jesmer and Harris, of Chicago (Charles E. Tannen and Bernard H. Ostrowsky, of counsel), for appellees.

PRESIDING JUSTICE WILSON delivered the opinion of the court:

Plaintiff sued defendants for injuries she received when struck by a taxicab owned by defendant Yellow Cab Company and driven by defendant Harvey. After extensive testimony, the jury returned a verdict of $25,000 in favor of plaintiff. Subsequently, the trial court granted defendant's motion for judgment notwithstanding the verdict and also entered a conditional order for a new trial in the event the judgment notwithstanding the verdict was reversed on appeal.

On appeal, plaintiff contends that: (1) the trial court usurped the jury's function when it entered a judgment notwithstanding the verdict; and (2) the trial court erred in entering a conditional order for a new trial where no grounds for such an order existed. For reasons that follow, we reverse the circuit court.

The pertinent facts reveal that on July 30, 1973, approximately 6 p.m., plaintiff, age seven, was struck by a cab owned by Yellow Cab Company and driven by Tristano Harvey in the 2500 block of West Harrison Street in Chicago. Harrison Street is a four-lane, east-west street with the two center lanes used for traffic and the two outer lanes for parking. As a result of the accident, plaintiff suffered multiple fractures, an abrasion and contusion to the forehead and an injury to the lip.

Pursuant to section 60 of the Civil Practice Act (Ill. Rev. Stat. 1981, ch. 110, par. 60), plaintiff called defendant Tristano Harvey as her first witness. Harvey stated that on July 30, 1973, as he approached the 2500 block of West Harrison, he noticed children playing on the grass and on the porches. Harvey indicated that there were no speed limit signs posted on Harrison. However, he knew that when no speed limit signs are posted, the maximum speed limit is 30 miles per hour.

When questioned by defense counsel, Harvey stated that he was traveling about 25 miles per hour as he approached the 2500 block of Harrison, heading west. He saw cars parked on the north side of the street. As he approached the parked cars, a little girl darted out from between two of them in front of his cab, and ran across the street. Harvey reacted by patting his brakes, thereby reducing his speed to 15 miles per hour. When the cab was even with the first parked car,

Harvey then saw plaintiff standing in front of the second parked car. When she darted out into the street, defendant pulled to the left and slammed on the brakes. As he pulled to the left, he heard a thump on the side of his cab. He hit the brakes harder and the cab went into a counterclockwise skid. When the cab finally stopped, it was headed in an easterly direction.

On recross by plaintiff's counsel, Harvey somewhat altered his description of where the parked cars were in relationship to the children. Harvey indicated that he was at "the tail end of the first parked car" when the first child darted out between the second and third parked cars, and plaintiff was standing two cars away from the first child. At the time of the collision, Harvey stated that he was traveling approximately 15 miles per hour.

Next, Thelma Wright, plaintiff's mother, testified that she was at home with her husband at 2533 West Harrison, Chicago, when Frank Williams, a neighbor, came to their window and told them that their daughter had just been hit by a car. When Mrs. Wright arrived at the scene of the accident, plaintiff was lying on her side on the north side of the street with her arm folded back and her leg twisted at the ankle. When queried as to plaintiff's safety training, Mrs. Wright stated that she had instructed plaintiff to look in both directions before crossing streets and that plaintiff appeared to follow her instructions.

On cross-examination, Mrs. Wright testified that she started giving safety instructions to plaintiff before she started kindergarten, including instructions not to cross the street if an oncoming car was too close. However, she never defined "too close." Mrs. Wright further admitted that she took plaintiff to see Dr. Sheinkop the weekend before trial for the sole purpose of helping him prepare his testimony.

Next, Salita McDowell, passenger in defendant's cab at the time of the accident, testified on behalf of plaintiff. McDowell stated that in the early evening of July 30, 1973, she entered defendant's cab in front of a medical clinic that she had just visited. When she entered the cab, defendant told her that he did not have time to take her anywhere. However, when she told him that she did not feel well, he agreed to take her home. Because she was not feeling well, McDowell laid down on the back seat of the cab. Suddenly, as the cab was heading west on Harrison, it started sliding around, causing McDowell to fall to the floor and hit her head. Prior to this sudden movement, she had not heard any thumps on the side of the cab or the cab's horn. Further, although she did not actually look at the speedometer, McDowell testified that, in her opinion, the cab was traveling between 40 and 45 miles per hour right before the accident. McDowell further

stated that when the cab stopped spinning, defendant turned around in his seat and asked McDowell if she was all right. He then told her to stay in the cab, and he got out. McDowell also left the cab for a few minutes and started to walk around. She noticed several people looking at something further down the street. While she was walking, someone approached her and asked her if she was all right and advised her to sit in the cab.

On cross-examination, McDowell stated that she never saw the cab strike anything, but she felt it. Moreover, at one point during the cab ride, McDowell had complained to defendant Harvey that he was driving too fast, but he never slowed down. When she got out of the cab after the accident, she saw a little girl lying in the street next to some parked cars. McDowell admitted that on the day after the accident, she signed a statement which stated that other than driving a little fast, defendant Harvey was driving "safe and okay."

Next, Frank Williams, eyewitness to the accident, testified on behalf of plaintiff. On July 30, 1973, Williams was sitting on a log on the south side of Harrison Street, facing the street. From this vantage point, he saw the entire accident in which plaintiff was injured. According to Williams, defendant Harvey was driving west on Harrison at approximately 35 to 45 miles per hour. When plaintiff was struck by the cab, she was standing in the parking lane approximately eight to 10 feet in front of a parked car. There were no parked cars to the west of plaintiff. Williams stated that he never heard a horn, screech of tires or any other type of warning. After the cab struck plaintiff, it continued westward until it hit a viaduct, spun around and faced east. Williams further testified that plaintiff was "laying to the left, up from the left fender of the parked car." Her arm was folded up her back and her leg was bent underneath her. After the accident, Williams knocked on the Wrights' window and told Mrs. Wright that plaintiff had been hit by a car.

On cross-examination, Williams stated that the cab was in the traffic lane, going west, until it reached the spot where plaintiff was standing. It then veered right toward the parking lane and struck plaintiff. The cab did not hit the parked car, nor did it go up on the curb. Further, after striking plaintiff, the cab swerved to the left and continued west until it hit the viaduct about a block west of where plaintiff was hit. At this point in his cross-examination, defense counsel asked Williams to look at an unsigned statement allegedly given by him several years earlier to an insurance investigator. When asked if it was a true and correct statement, Williams answered, "No, Sir," although he admitted to making certain parts of the statement. Wil-

liams further testified that the front end and side of the cab were damaged when it scraped the curb, and he thought one of the tires blew out and a hubcap fell off.

On redirect, Williams stated that the man who took the statement from him in the presence of Williams' wife and a small child, offered to pay him if he signed the statement. Williams refused.

Thereafter, outside the presence of the jury, defense counsel argued that Dr. Sheinkop was not plaintiff's treating physician and, thus, should not be permitted to testify as to any diagnosis. In response, plaintiff's counsel stated that the records indicate that Dr. Sheinkop was the attending physician and that all treatments of plaintiff at the hospital were performed by interns or residents directly under Dr. Sheinkop's control and supervision. Defendants' motion was denied.

Dr. Mitchell B. Sheinkop, orthopedic surgeon, then took the stand on behalf of plaintiff. Dr. Sheinkop testified that as assistant professor of orthopedics at Rush-Presbyterian Medical Center, he oversees the work of certain interns and residents, verifies their filed reports, and discusses cases with them. In plaintiff's case, Dr. Richard Sidell, orthopedic resident in training, and Dr. Ellen Divine, senior orthopedic resident on the service, saw plaintiff in the emergency room on July 30, 1973. Their findings were discussed with Dr. Sheinkop and a treatment plan was approved. Further, all written reports filed by the residents were personally reviewed by Dr. Sheinkop.

On cross-examination, Dr. Sheinkop admitted that he did not personally examine plaintiff before treatment. However, he did supervise and approve the treatment given by the attending residents. Moreover, Dr. Sheinkop stated that, on occasion, he personally treated plaintiff. When queried as to why his treatment was not recorded on the hospital chart, Dr. Sheinkop replied that he rarely makes entries on any chart because that is "a responsibility for which house staff is compensated." Regarding his examination of plaintiff on March 14, 1981, Dr. Sheinkop testified that the purpose of the exam was to evaluate her disability in preparation for trial, and not for any particular treatment.

On redirect, Dr. Sheinkop reviewed the surgical discharge summary which contained a notation that plaintiff suffered from pain when admitted. In addition, he read portions from the pediatric physical and examination report and the neurosurgical consultation report, which verified plaintiff's condition upon admittance. In response to the court's query as to whether Dr. Sheinkop himself made any entries on those documents, the doctor stated that he had not, but that

his signature appears on the face sheet of the record, which means that he assumes all burdens and responsibilities for the care of the patient.

Next, Pamela Wright, plaintiff, testified that although she did not remember anything about the accident itself, or about the period shortly before or after the accident, she did remember being in the hospital, having a cast on her left leg and on her right arm, and experiencing a great deal of pain.

After plaintiff rested her case, defendants' motion for a directed verdict on contributory negligence was granted as to Mrs. Wright and reserved as to the minor plaintiff.

Next, Harry Krope, a Chicago police officer assigned to accident investigation and motor enforcement, testified on behalf of defendants that on July 30, 1973, he investigated an automobile/pedestrian occurrence at 2542 West Harrison, Chicago. When he arrived at the scene, he noticed two or three parked cars on the north side of Harrison. Plaintiff was lying near the center of the street, "out to the north side of the street," in the westbound traffic lane. She had not been moved. Defendant Harvey refused to give a statement at the scene. Krope further stated that he spoke with plaintiff at the hospital, in the presence of nurses and a doctor, and she told him that she had run across the street into the side of a cab.

On cross-examination, Krope testified that he interviewed plaintiff while she was in the emergency room and nurses were putting her leg in a cast. He did not talk to her doctor or ask anyone for permission to see her. Further, there was nothing in his police report indicating that plaintiff had made those statements. Moreover, there were no names in the report of witnesses Krope allegedly interviewed at the scene.

Next, Anthony Winrow testified on behalf of the defendants that on April 8, 1977, he took a statement from Frank Williams regarding the accident which had occurred on July 30, 1973. In an effort to impeach Williams' testimony, Winrow read the following portion of Williams' statement into evidence:

> "*** I witnessed Pamela Wright attempting to cross Harrison from north to south. And she walked into the right front side of the Yellow Cab, that was westbound on Harrison. *** Pamela ran from between the parked vehicles that was [sic] parked at the north curb, facing west. The cab driver tried to avoid Pamela by cutting to the left. After the child ran into the side of the cab, the driver lost control and ran over to the south curb. The cab was traveling at about 20 miles per hour.

And the streets were dry."

On cross-examination, Winrow stated that unless he refreshed his recollection by looking at his report, he could not remember anything more about the actual taking of the statement. He could not remember where the statement was taken, and "vaguely" remembered that Williams' wife had been present, or at least someone else had been present. Winrow did recall, however, that Williams had asked Winrow to pay him for his signature on the statement. When Winrow refused, Williams would not sign. At the time Winrow took the statement, he was employed by Calumet Insurance Company and was paid a weekly salary.

Next, defendant Harvey took the stand and testified that: (1) he never turned the cab to the right at any time after he saw the first child; (2) the cab never veered from the traffic lane into the parking lane; (3) the cab never came within two feet of the north curb; and (4) the speed of the cab never exceeded 25 miles per hour between Denver and Rockwell Streets (cross streets south and north, respectively, of the accident scene).

On cross-examination, defendant stated that, as far as he could remember, his left rear tire blew out after the accident. Furthermore, the first child darted out into the street from in front of the second parked car. After the impact with plaintiff, the car went out of control, the tire blew out, and the cab went into a skid. However, it did not strike the viaduct. Defendant further testified that, prior to the accident, he had had no conversation with McDowell other than regarding her destination. However, he did admit that she said something to him, but he could not hear her through the cab's glass shield. The defense then rested its case.

On rebuttal, Mrs. Wright testified that she was with her daughter at all times when she was in the emergency room at the hospital and never saw Officer Krope. On cross-examination, Mrs. Wright admitted that she saw defendant Harvey at the hospital, but she did not have a conversation with him.

After defendants rested, the trial court reserved its ruling on their motion for a directed verdict. Thereafter, the court instructed the jury, stating, *inter alia*, that Thelma Wright had been found guilty of contributory negligence as a matter of law. Thus, medical and hospital bills were not to be considered in the determination of damages. Closing arguments ensued. During his closing argument, plaintiff's counsel summarized the scene of the accident as follows:

"There has been an impact with Pamela Wright by the cab. Mr. Harvey is in his cab. He said, he's worried about the crowd out

there. The police officer arrives. The police officer talked to him. He doesn't explain about the case or the accident to the police officer. He doesn't even give his version: 'Officer, the girl ran out in front of the street. I was going 15 miles an hour. I was doing real well.' He said, 'I'll give my report to the insurance company or my associates or something.' "

At this point, defense counsel objected and moved for a mistrial on the ground that there was no such evidence presented. The court overruled the objection, stating that the name of the insurance company had been brought out earlier. Shortly thereafter, the court interrupted plaintiff's closing argument and stated:

"I was at error before when I said that the Defendant gave the name of the insurance company. The Defendant did not give the name of his insurance company. The Defendant said that he would make his statement to his supervisor. I was wrong when I ruled that. I want to correct that. All right."

As plaintiff's closing argument continued, defendant objected to the following comments: (1) adults have a duty to protect children; (2) the ambulance ride was "terrifying"; and (3) the accident had a psychological effect on plaintiff. The trial court sustained the objections and, except for the objection to "terrifying," advised the jury to disregard the remarks.

During plaintiff's rebuttal argument, defense counsel objected to: (1) plaintiff's suggestion that defendants had the burden of proof regarding their arguments about plaintiff's scar; and (2) plaintiff's remark to the jury that it is difficult to think back to when we were seven years old. The court sustained the objections and advised the jury to disregard the remarks.

Thereafter, the jury returned with its verdict in favor of plaintiff and assessed plaintiff's damages in the sum of $25,000. Subsequently, defendants' post-trial motion for judgment notwithstanding the verdict was granted and the court entered a conditional order for a new trial in the event the judgment notwithstanding the verdict was reversed. Plaintiff's timely appeal followed.

OPINION

Plaintiff first argues that the trial court erred in granting defendants' motion for judgment notwithstanding the verdict. In particular, plaintiff contends that the court improperly usurped the jury's function to decide the factual issue of plaintiff's contributory negligence. Further, plaintiffs argue that defendants' post-trial motion insufficiently set forth the grounds for entry of a judgment notwithstanding

the verdict.

 The standard for determining contributory negligence as a matter of law on a motion for judgment notwithstanding the verdict is whether all the evidence, when viewed in its aspects most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on that evidence could ever stand. (*Hayes v. Alsburg* (1978), 72 Ill. 2d 560, 566, 382 N.E.2d 239.) Therefore, where the evidence demonstrates a substantial factual dispute, or where the assessment of the credibility of witnesses or determination regarding conflicting evidence may be decisive of the outcome, it is error to direct a verdict or enter judgment notwithstanding the verdict. (*Reynolds v. American Oil Co.* (1975), 32 Ill. App. 3d 905, 909, 337 N.E.2d 403.) In addition, the jury's resolution of disputed facts may not be set aside by the trial court simply because it believes a different result is more reasonable. (*Nacvich v. Downing* (1977), 50 Ill. App. 3d 935, 940, 365 N.E.2d 1343.) Under our system of jurisprudence, jury determinations can be set aside only when a court of review, or a trial court upon proper motion, is clearly satisfied that they were occasioned by passion or prejudice or found to be wholly unwarranted from the manifest weight of the evidence. *Riley v. Johnson* (1981), 98 Ill. App. 3d 688, 691, 424 N.E.2d 842.

 After a careful review of the record in this case, we find a reasonable basis exists in the facts for the jury's conclusion, and find no indication that the jury's decision was occasioned by passion or prejudice. The following facts support our findings. Testimony by Frank Williams, sole eyewitness to the accident, indicated that plaintiff was struck by defendants' cab while she was standing in the parking lane of Harrison Street. Although there was no testimony that plaintiff looked both ways, Williams testified that plaintiff was standing motionless in the parking lane while defendant proceeded westward down the street. Defendants argue that Williams' testimony was incredible because the westbound cab could not possibly have swung into the parking lane, hit plaintiff, and then swung out again without hitting another parked car or curb on the north side of the street. Contrary to defendants' contention, there is testimony that the cab scraped the north curb and also that the cab's right front fender was damaged. Furthermore, both Williams and defendant Harvey testified that there were two or three cars parked along the north curb of Harrison and that plaintiff was standing in front of the last parked car. According to Williams, plaintiff was standing in front of the last parked car. According to Williams, plaintiff was standing approximately eight to 10 feet in front of the last parked car and approxi-

mately two feet away from the curb. Williams also testified that there were no additional parked cars to the west of where plaintiff was standing. Confronted with these facts, we cannot conclude that the evidence, when viewed in the aspect most favorable to plaintiff, so overwhelmingly favors defendant that the verdict for plaintiff could not stand.

■■ Furthermore, it is well-established in Illinois that a child between the ages of seven and 14 is presumed to be incapable of contributory negligence. (*Hardy v. Smith* (1978), 61 Ill. App. 3d 441, 443, 378 N.E.2d 604.) However, this presumption can be rebutted by offering proof that the particular child, based on age, mental capacity, intelligence and experience, was accountable for his actions. (*Riley v. Johnson* (1981), 98 Ill. App. 3d 688, 692, 424 N.E.2d 842.) Once such proof is presented, the question of contributory negligence becomes a question of fact which must be left to the jury to determine. *Pellegrini v. Chicago, Rock Island & Pacific R.R. Co.* (1980), 91 Ill. App. 3d 1091, 1093, 415 N.E.2d 615.

■ Upon reviewing the record, it is our opinion that defendants did not effectively rebut the presumption. Accordingly, because the jury could properly have reached its verdict based upon the evidence presented, we hold that the trial court abused its discretion in granting a judgment notwithstanding the verdict in favor of defendants.[1]

■■ ■ We next consider plaintiff's contention that the trial court erred in granting defendants a new trial in the event the judgment notwithstanding the verdict was reversed. Initially, plaintiff argues that defendants waived their right to seek or obtain a new trial when they failed to move for a mistrial after their objections were sustained. In support of her position, plaintiff relies on *Bauer v. Timucci* (1975), 33 Ill. App. 3d 1051, 339 N.E.2d 434. After reviewing *Bauer*, we find it to be inapplicable to the pending case on the ground that the prejudicial conduct alleged in *Bauer* was not brought to the attention of the trial court by either an objection or a motion for mistrial. By contrast, in the pending case, objections were immediately entered on all points raised by defendants in their motion for a new trial. Illinois law has long recognized that a simple objection is enough to preserve the issue of misconduct for consideration of a post-trial motion. (*Appel v. Chicago City Ry. Co.* (1913), 259 Ill. 561, 102 N.E. 1021.) Therefore, we conclude that because defense counsel entered timely

---

[1]This conclusion obviates the need to discuss the sufficiency of that portion of defendants' post-trial motion which requested entry of a judgment notwithstanding the verdict.

objections to plaintiff's remarks at trial and specifically set forth the errors in his post-trial motion (*Harrison v. Chicago Transit Authority* (1977), 48 Ill. App. 3d 564, 566, 363 N.E.2d 81), the issue of whether defendants were denied a fair trial was properly preserved.

We next address plaintiff's contention that if defendants' allegations of misconduct were properly preserved, none were sufficient, separately or cumulatively, to properly warrant a new trial. Specifically, the post-trial motion stated the following grounds for a new trial: (1) plaintiff's attorney misquoted defendant Harvey, thereby injecting the topic of insurance into a portion of the trial where no such topic had been mentioned by defendant; (2) the court erred in not granting defendants' motion for a mistrial when plaintiff's attorney asked for a stipulation as to the introduction of certain photographs in the presence of the jury; (3) the trial court erred in admitting Dr. Sheinkop's testimony; (4) plaintiff's attorney misquoted the evidence during closing argument; (5) plaintiff's attorney misstated the law; (6) plaintiff's attorney attempted to inflame the jury by describing plaintiff's ride in the ambulance as "terrifying"; (7) plaintiff's attorney misrepresented the burden of proof; (8) plaintiff's attorney asked the jurors to put themselves in plaintiff's position; and (9) the damages awarded by the jury were grossly excessive, unreasonable, and unwarranted by the evidence to the degree that they cannot be cured by remittitur.

 Regarding the issue of insurance, defendants alleged that plaintiff's counsel interjected the issue of insurance on cross-examination in a deliberate effort to prejudice the defendants and to bring before the jury the irrelevant fact of insurance. A review of the record reveals this allegation to be patently untrue. Defendants themselves introduced the issue of insurance into the case when they put Anthony Winrow, claims adjuster for Calumet Insurance Company, on the stand in an effort to impeach the testimony of Frank Williams with a statement allegedly taken by Winrow during the course of his employment several years after the accident. On cross-examination of Winrow, plaintiff asked for the name of Winrow's employer at the time the statement was taken. Defense counsel's objection was overruled and Winrow answered, "Calumet Insurance." We find no error in eliciting this testimony on the ground that the identity of the person taking a statement, the nature of his employment and the name of his employer are material for the purpose of showing his interest, if any, in the litigation. (*Yelm v. Masters* (1967), 81 Ill. App. 2d 186, 195-96, 225 N.E.2d 152.) In fact, during the hearing on defendants' post-trial motion, defense counsel admitted that he had introduced

Winrow as a witness at his own peril. Further, we do not find that plaintiff's attorney's misstatement of defendant Harvey's testimony, wherein he said that Harvey gave his accident report to the insurance company, was ground for reversible error. While there is no question that the remark was improper, we recognize that the almost universal prevalence of automobile liability insurance, especially with regard to taxicab companies, has resulted in an increasing judicial tolerance toward references to insurance. (*Kitsch v. Goode* (1977), 48 Ill. App. 3d 260, 266, 362 N.E.2d 446.) Moreover, a reference to insurance during trial is not *per se* reversible. Rather, prejudice must be shown. (*Joynt v. Barnes* (1979), 71 Ill. App. 3d 187, 198, 388 N.E.2d 1298.) In this regard, the Illinois supreme court in *Sheley v. Guy* (1976), 63 Ill. 2d 544, 348 N.E.2d 835,[2] held that where a finding of liability has a complete basis in the evidence and the damage award is reasonable, the courts will conclude that the jury was not prejudiced by the remark. (63 Ill. 2d 544, 546.) Accordingly, because the evidence in our case supports the jury's verdict and there is no contention on appeal that the damages were unreasonable, we find no indication that the jury was prejudiced by the insurance remark. Thus, it is not grounds for reversible error.

■■■ Regarding plaintiff's request that defense counsel stipulate to certain photographs of the damaged cab in front of the jury, defendants argue that this conduct on the part of the prosecution forced an objection by defense counsel and thereby raised an inference that defendant was attempting to hide probative evidence of guilt. We do not agree. While an offer to stipulate to the admission of evidence in the presence of the jury is improper (*People v. Hovanec* (1976), 40 Ill. App. 3d 15, 351 N.E.2d 402), such conduct does not constitute reversible error without a showing of prejudice. *People v. Burdine* (1978), 57 Ill. App. 3d 677, 685, 373 N.E.2d 694.

In the pending case, during cross-examination, defendant Harvey was shown a photograph of the cab taken after the accident. After he identified it as being a photograph of his cab, his counsel was asked if he would stipulate to the introduction of the photo into evidence. An objection was made, and at the side-bar conference, defense counsel's motion for a mistrial was denied. The court then discussed with both counsel whether a statement should be made to the jury regarding

---

[2]We further note that defendants' reliance on *Cecil v. Gibson* (1976), 37 Ill. App. 3d 710, 346 N.E.2d 448, for the proposition that "the mention of insurance during trial is *per se* reversible error" is rendered unpersuasive by the *Sheley* court's holding.

the fact that plaintiff's counsel should not have made the request to stipulate in the presence of the jury. Defense counsel agreed that it might help. Subsequently, the trial court made a lengthy statement to the jury, informing them that the request was improper and that no unfair implication should arise because of defense counsel's refusal to stipulate.

While we do not condone the action of plaintiff's counsel, we note that the exchange was an isolated incident, the photographs were not inadmissible evidence if properly presented, and the jury was properly admonished as to the impropriety of counsel's remarks. These facts plus the ample evidence supporting the jury's verdict lead us to conclude that the request to stipulate was not so prejudicial as to warrant reversal. In reaching this conclusion, we further note that *People v. Hovanec* (1976), 40 Ill. App. 3d 15, 351 N.E.2d 402, relied upon by defendants, is factually distinguishable from the pending case. In *Hovanec*, the court noted that "the more reprehensible conduct was the persistent asking of the question after an objection to it had been sustained." (40 Ill. App. 3d 15, 18.) As stated, the request to stipulate in our case was an isolated occurrence, more than adequately remedied by the trial court.

■■■ Regarding defendants' contention that it was error for Dr. Sheinkop to testify from hospital records not prepared by him, we find *People v. Ward* (1974), 19 Ill. App. 3d 833, 313 N.E.2d 314, *aff'd* (1975), 61 Ill. 2d 559, 338 N.E.2d 171, dispositive of the matter. In *Ward*, a psychiatrist expert testified that it was his opinion that the accused was sane at the time of the crime. While the doctor admitted that he based his conclusion as to the defendant's sanity in part on the examination and report of another psychiatrist, he also asserted that he directly supervised the other psychiatrist and that the official opinion was rendered at his direction. On appeal, defendant claimed that he was denied his constitutional right to cross-examine a witness when the report of an examining psychiatrist who was not called to testify was admitted. In affirming the trial court's judgment, the appellate court stated:

"In our opinion, the defendant was not denied his constitutional right of confrontation. We believe that the report signed by Dr. Reifman was a staff report reflecting the official opinion of the Psychiatric Institute. Dr. Kelleher, as chief of staff of the Psychiatric Institute, appropriately testified regarding the official opinion rendered by his subordinates and at his direction. Since the report was made under the direction and supervision of Dr. Kelleher, he was fully capable of testifying to the mat-

ters in the report and was available for cross-examination on the report." 19 Ill. App. 3d 833, 838.

Similarly, in the case at bar, the residents who examined plaintiff in the hospital were directly under Dr. Sheinkop's supervision. In this regard, Dr. Sheinkop testified that in teaching hospitals like the one at which plaintiff was treated, it is customary practice for residents to institute emergency room care of the patient, then contact the attending orthopedic surgeon to discuss problems, their interpretations and findings, and to determine the treatment plan to be followed. Dr. Sheinkop further stated that this customary practice was followed in plaintiff's situation and that he was the attending orthopedic surgeon. Therefore, we conclude that because Dr. Sheinkop had direct supervisory control over the attending residents, reviewed their filed reports and proposed treatment plans and was also fully capable of being cross-examined as to the matters contained in the reports, the trial court did not err in admitting Dr. Sheinkop's testimony.

We next address defendants' contention that they were denied a fair trial when plaintiff's attorney asked the jury to place themselves in the position of a seven-year-old. In support of their position, defendants rely on *Copeland v. Johnson* (1965), 63 Ill. App. 2d 361, 211 N.E.2d 387. After reviewing *Copeland,* we find that it rebuts, rather than supports, defendants' position. In *Copeland,* defense counsel directly asked the jurors to put themselves in the position of defendant. No objection was made by plaintiff. On appeal, although the court recognized defense counsel's statement as being improper, it noted, "We feel this error could have been cured by the court upon proper objection." 63 Ill. App. 2d 361, 367.

We concur with the *Copeland* court's analysis. In the case at bar, defendants' objection to the reference was sustained and the jury was advised to disregard the remark. Thus, we conclude that the error was cured and presented no ground for a new trial.

Finally, defendants claimed that plaintiff's misstatement of the law, misstatement of the evidence and inflammatory characterization of the ambulance ride denied them a fair trial.

Initially, we note that it is improper for an attorney to misstate the law before the jury (*Northern Trust Co. v. Skokie Valley Community Hospital* (1980), 81 Ill. App. 3d 1110, 1126, 401 N.E.2d 1246), and to argue outside the limits of admitted or uncontroverted facts. (*Hopwood v. Thomas Hoist Co.* (1966), 71 Ill. App. 2d 434, 444, 219 N.E.2d 76.) However, when a remark is objected to, the objection is sustained, and the jury is instructed to disregard the remark, there is no reason to believe that the jury was prejudiced. (*Zindrick v. Drake*

(1979), 75 Ill. App. 3d 702, 706, 393 N.E.2d 1277.) In the case at bar, each of the aforementioned statements was objected to at trial and the objections were sustained. Moreover, the jury was instructed to consider only the testimony of the witnesses in making their determination of facts, and that neither opening statements nor closing arguments could be considered as evidence. In view of the evidence presented at trial, we cannot conclude that plaintiff's closing argument and rebuttal influenced the result or that the verdict would have been otherwise had the remarks not been made.

In our judgment, the trial court should have denied defendants' post-trial motion in its entirety. Accordingly, for the reasons stated, the judgment of the circuit court of Cook County is reversed and the cause remanded with instructions to reinstate the verdict for $25,000 in favor of plaintiff.

Reversed and remanded with instructions.

SULLIVAN and MEJDA, JJ., concur.