AMANIE FAKHOURY, a Minor, by Ibraham Fakhoury, her Father and Next Friend, Plaintiff-Appellee, v. VAPOR CORPORATION, Defendant-Appellant.

First District (2nd Division)   No. 86—1058

Opinion filed March 17, 1987.—Rehearing denied May 6, 1987.

Cassiday, Schade & Gloor, and Hinshaw, Culbertson, Moelmann, Hoban & Fuller, both of Chicago (D. Patterson Gloor, Kevin G. Burke, Stephen R. Swofford, and H. Anne McKee, of counsel), for appellant.

Fishman & Fishman, Ltd., and Debofsky & Debofsky, both of Chicago (Ronald S. Fishman and Mark D. Debofsky, of counsel), for appellee.

JUSTICE STAMOS delivered the opinion of the court:

Ibraham Fakhoury filed suit on behalf of plaintiff, his five-year-old daughter, seeking damages for injuries she received when struck by a car operated by James Guyon, defendant's employee. The employee settled with plaintiff prior to trial. At trial, the court granted plaintiff a directed verdict on the issue of *respondeat superior* and the jury found against defendant on the negligence issue and awarded damages. Thereafter, judgment was entered on the verdict. Defendant now appeals.

On October 12, 1977, plaintiff Amanie Fakhoury was injured when she was struck by an automobile driven by James Guyon. Plaintiff allegedly suffered brain damage, hemiparesis and other injuries. On April 6, 1978, plaintiff filed an action in negligence against Guyon. An amended complaint was filed on April 30, 1979, naming Guyon's employer, defendant Vapor Corporation, as a party defendant based upon a theory of *respondeat superior*; plaintiff alleged that Guyon was in the employ of defendant and was acting within the scope of his employment at the time of the accident.

Stanley Lemieux, defendant's vice-president, testified that the company is located on the northwest side of Chicago and is a manufacturer of heating equipment. Lemieux explained that Guyon was a serviceman employed by defendant. He was one of four such servicemen employed at the time of the accident and was supervised by a service manager. As a serviceman, Guyon's responsibility was to start up new equipment at a customer's site after installation and to perform any needed maintenance and repair on this equipment.

Defendant's customers are billed for a serviceman's hourly work and for his travel time. Servicemen are paid a fixed salary by defendant. They are required to use their own cars to travel to job sites and are reimbursed by defendant for doing so. Servicemen are directed to a job site from defendant's plant site or from their homes. When they have no service work scheduled, servicemen are required to be present at the plant and must return there after a job is completed if there is time to do so. Each serviceman is issued a set of tools by defendant and is required to carry the tools with him at all times. However, they are authorized to purchase certain standard tools at their discretion provided it is not a major expenditure and may make their own travel plans.

On cross-examination, Lemieux testified that the service manager

and not the individual servicemen decide on what job they will work. When traveling, servicemen are required to call daily. Lemieux stated that each serviceman is issued a standard service tool kit. If, while he is on a job, a serviceman finds that he needs a certain tool, he must contact the service manager who will either send this tool or will authorize the serviceman to purchase it. Lemieux maintained that this procedure was a control function to insure that discretionary purchases were appropriate.

Guyon testified that he had been employed by defendant as a service representative for 20 years. He stated that he drove his own car to and from job sites and was required to maintain insurance on his car; Guyon was given a mileage allowance by defendant for travel. Guyon's tool kit includes meters for checking electricity, manometers, $CO_2$ and $O_2$ meters and equipment for checking combustion as well as an assortment of small hand tools.

On the date of the accident, Guyon was at defendant's plant doing routine paperwork. He had been assigned to travel to Madison, Wisconsin, the following day and planned to leave from his home at 6 a.m. When Guyon left work at 4:30 p.m. that evening, he stated that he stopped at a hardware store at Clark and Ashland to purchase a carpenter's square for his use the next day. When that store did not have this item, Guyon returned to his car and began to drive southbound on Ashland to a lumber store in the vicinity. While proceeding there, south of the intersection of Ashland and Berwyn, Guyon heard a thump and felt something strike the front of his car. Guyon stopped and saw plaintiff lying in the street approximately 25 feet behind his car. There were no eyewitnesses to the accident. A passing ambulance stopped moments later to render assistance to plaintiff and transported the child to the hospital. Guyon did not purchase a carpenter's square that evening. Upon his arrival in Madison, Wisconsin, the following day, he borrowed the customer's carpenter's square.

Thad Aycock, a senior consultant in the Accident Investigation Division of Northwestern University Traffic Institute, testified as to the length of time required to brake a moving vehicle. Aycock explained that speed, rate of deceleration and the slipperiness of the road surface as well as reaction time are factors used to determine braking distance. He explained that given a car traveling on dry pavement at approximately 25 miles per hour, the rate of speed at which Guyon stated he was traveling, it would take 130 feet for such car to brake. This braking distance is a mathematical equation involving speed, drag factor and deceleration. After adding an additional one-second delay during which a driver reacts to a situation, Aycock stated that

Guyon's car would require 166 feet to reach a complete stop.

Sister Marlene Geimer, an elementary school principal, testified that she drove by the intersection of Ashland and Berwyn moments after the accident. She saw a small "rolled up kind of person" in the middle of the street and a small shoe in the northbound lane of Ashland 10 feet south of the crosswalk at Berwyn. The injured child was lying further south approximately two car lengths away from the shoe.

On cross-examination, Sister Geimer stated that she did not know to whom the shoe belonged. She could not remember telling plaintiff's mother that the shoe was 40 or 50 feet south of the crosswalk.

Three of plaintiff's five brothers and sisters testified that on October 12, 1977, the six children left home to buy candy. When plaintiff's brother refused to buy candy for plaintiff, she ran home and was given money by her mother, then left to meet her brothers and sisters again. She was on her way to the store when the accident occurred. On cross-examination, defendant was precluded by the court from questioning the children as to whether plaintiff was ever told by anyone in her family to stop when she came to an intersection, on the grounds of hearsay.

Janet Fakhoury, plaintiff's mother, testified that plaintiff remained in a coma for approximately six weeks following the accident. Thereafter, plaintiff was transferred to the Rehabilitation Institute of Chicago. Upon admission, she suffered from hemiparesis on the right side, was unable to walk and had difficulty with reading, verbal formulation and retention. Plaintiff received speech therapy, occupational therapy and physical therapy and was discharged approximately 10 weeks later. Plaintiff was required to return for periodic therapy during the following year. Plaintiff had improved but needed help with daily activities, and her speech and thought retention were below normal.

Limas Bieliauskas, a clinical psychologist and neuropsychiatrist, testified that he tested plaintiff in May 1984. He found her intelligence quotient was 89 at that time, which is considered low average, while plaintiff's verbal intelligence quotient was near what would be considered borderline mentally retarded. Bieliauskas also found that plaintiff was two grade levels below normal in comprehension and general information and that she had difficulties with memory. Over defendant's objections, Bieliauskas testified that plaintiff would be later affected in the job market by her impairments. Bieliauskas opined that plaintiff would experience difficulty with any job which required bilateral dexterity and higher levels of understanding.

Bieliauskas' findings were complemented by those of Dr. Harold Klawans, a neurologist who also examined plaintiff. Klawans found that there was an alteration in plaintiff's mental status and intellectual function and that plaintiff suffered from decreased coordination and a lack of fine motor movements. Klawans opined that plaintiff would not be able to attend college and that the occupational activities that plaintiff could perform consisted of unskilled labor requiring limited intellectual functions.

Prior to trial, the court granted defendant's motion *in limine*, banning any reference to defendant's size, wealth and financial condition. During *voir dire*, plaintiff's counsel asked a prospective juror whether he had ever heard of Brunswick Corporation, defendant's parent company. Defendant objected and moved for a mistrial. The trial court denied the motion and stated that such inquiry regarding whether a juror is familiar with a parent company is within proper *voir dire*. Thereafter, plaintiff's counsel referred to defendant's "parent company" on two occasions; on each occasion, defendant's objection was sustained.

■■ ■ Appellants' initial contention is that the court erred in directing a verdict regarding agency. According to the often-cited *Pedrick* standard, verdicts ought to be directed and judgments notwithstanding the verdict entered only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict based on the evidence could ever stand. (*Pedrick v. Peoria & Eastern R.R. Co.* (1967), 37 Ill. 2d 494, 229 N.E.2d 504; see also *Long v. City of New Boston* (1982), 91 Ill. 2d 456, 440 N.E.2d 625; *Bentley v. Saunemin* (1980), 83 Ill. 2d 10, 413 N.E.2d 1242.) In applying the *Pedrick* rule, the evidence presented and the inferences which can be drawn from the circumstances may be considered by the court. (*Huckabee v. Bell & Howell, Inc.* (1970), 47 Ill. 2d 153, 265 N.E.2d 134.) However, if reasonable minds may differ as to the inferences and conclusions to be drawn from the facts it is improper to direct a verdict or to enter judgment notwithstanding the verdict. (*Reuter v. Kocan* (1983), 113 Ill. App. 3d 903, 446 N.E.2d 882.) Factual disputes presenting credibility questions or requiring evidence to be weighed should not be decided by the trial judge as a matter of law.

Where a substantial factual dispute exists, or where the assessment of the credibility of the witnesses or determination regarding conflicting evidence may be decisive of the outcome, judgment notwithstanding the verdict should not be entered. (*Mackey v. Daddio* (1985), 139 Ill. App. 3d 604, 487 N.E.2d 1167; *Wright v. Yellow Cab*

*Co.* (1983), 116 Ill. App. 3d 242, 451 N.E.2d 1313.) As was stated in *Pedrick*, "judges should carefully preserve the rights of the parties to have a substantial factual dispute resolved by the jury, for it is here that assessment of the credibility of the witnesses may well prove decisive." 37 Ill. 2d 494, 504, 229 N.E.2d 504.

■ It cannot be said that all the evidence regarding agency presented at trial, when viewed in its aspect most favorable to defendant, so overwhelmingly favored plaintiff that no contrary verdict could ever stand. Accordingly, we reverse and remand this cause for a new trial.

In view of our disposition, reversing and remanding for a new trial, we address the remaining contentions raised by defendant. Defendant's second contention on appeal is that Aycock's reconstructed testimony was inadmissible because expert testimony was not required and because it was used solely to contradict eyewitness testimony and it concerned matters within common knowledge. Defendant also maintains that Aycock's opinions were based on speculation and thus were not proper for consideration by the jury.

■ It is settled that where there is no available eyewitness testimony to an accident, other than defendant himself, expert testimony may be introduced as a substitute for direct lay eyewitness testimony. (*Coffey v. Hancock* (1984), 122 Ill. App. 3d 442, 461 N.E.2d 64.) The trial court's determination to admit such testimony will not be disturbed on appeal unless it is clearly shown that he abused his discretion. *Jamison v. Lambke* (1974), 21 Ill. App. 3d 629, 316 N.E.2d 93.

In *Finfrock v. Eaton Asphalt Co.* (1976), 41 Ill. App. 3d 1020, 355 N.E.2d 214, defendant was permitted to present the testimony of a traffic engineer who explained the formulae for determining stopping distances for vehicles on different types of road surfaces and at varying speeds. In upholding the admission of this testimony, the appellate court rejected the plaintiff's argument that such testimony constituted improper reconstructive testimony. Rather, the court found that the function of the expert testimony there was to translate the jury's general awareness that a faster-moving vehicle takes longer to stop into specific terms for the aid of the jury. The court held that there was a need for such testimony and that the expert's testimony was proper where it was limited to that one scientifically determinable aspect.

■ Here, Aycock's testimony was clearly within the limitations specified by the *Finfrock* court. Aycock merely testified to speed and stopping distances under normal and variable braking conditions. While the purpose of Aycock's testimony was to present to the jury that plaintiff may have been hit by Guyon's car as she entered the

crosswalk, Aycock did not testify that his calculations placed the accident at that site or at any other location. The result of Aycock's testimony was that the jury would be left to decide upon the credibility of Guyon as to his driving speed and the location at which plaintiff was struck. Such testimony was relevant and was properly admitted by the trial court.

Defendant's third contention on appeal is that evidence that plaintiff may not have been in the crosswalk at the time she was struck was improperly excluded. Specifically, defendant maintains that the court erred in not allowing defendant to cross-examine plaintiff's siblings as to the plaintiff's knowledge and habits on crossing streets or to rebut the testimony of Sister Geimer concerning the location of the shoe by presenting evidence that both of plaintiff's shoes were at the hospital.

The purpose of defendant's admission of this evidence was clearly to show that plaintiff was contributorily negligent in this instance. However, it is noted that a child of tender age, such as plaintiff here, is conclusively presumed not to be responsible for her acts and is not chargeable with contributory negligence in Illinois. (*Wallace v. Weinrich* (1980), 87 Ill. App. 3d 868, 409 N.E.2d 336; *Cusick v. Clark* (1977), 45 Ill. App. 3d 763, 360 N.E.2d 160; *Rios v. Sifuentes* (1976), 38 Ill. App. 3d 128, 347 N.E.2d 337; *Turner v. Seyfert* (1963), 44 Ill. App. 2d 281, 194 N.E.2d 529; *Dimucci v. Garnello* (1963), 43 Ill. App. 2d 426, 193 N.E.2d 601.) Accordingly, evidence bearing on plaintiff's conduct prior to the time of the accident is irrelevant.

As to defendant's fourth argument, during its cross-examination of Sister Geimer regarding the shoe she observed at the scene of the accident, Sister Geimer admitted that she did not know whether the shoe belonged to plaintiff. Thus, no prejudice was caused by the trial court's refusal to allow evidence that both of plaintiff's shoes were later present at the hospital.

Defendant's fifth contention on appeal is that plaintiff's repeated references to the size of defendant's corporation in violation of the court's order *in limine* constituted reversible error. Prior to trial, the court entered a motion *in limine*, precluding plaintiff from making any mention of defendant's size, wealth or financial condition during trial. Thereafter, during *voir dire*, plaintiff's counsel made three references to defendant's parent company, Brunswick, and to defendant's "parent company." Defendant maintains that such remarks were in violation of the court's order.

As the trial court found, inquiry into whether a juror is familiar with a parent company is proper *voir dire* as it could have been dis-

closed that a potential juror was a shareholder or employee of that larger company. In no instance did plaintiff inquire into the size, wealth or financial condition of defendant, nor did any of counsel's inquiry bear on the size of defendant.

■■ Defendant's final contention on appeal is that the trial court erred in allowing testimony on plaintiff's future employability and by instructing the jury that it could award damages for lost earnings.

It is true that an award of future loss of earnings cannot be sustained wherein the foundation is speculative or conjectural testimony; however, where such awards find their basis in testimony delivered with reasonable certainty, they must be upheld. (*La Salle National Bank v. City of Chicago* (1985), 132 Ill. App. 3d 607, 478 N.E.2d 417; *Doering v. Janssen* (1979), 76 Ill. App. 3d 62, 394 N.E.2d 721.) It is not necessary to establish an earnings history at the time of injury in order to be compensated for future loss of earnings. A youth with no earnings history should not be precluded from proving the future earning impact of his impairment in terms of his career ambitions. *Doering v. Janssen* (1979), 76 Ill. App. 3d 62, 394 N.E.2d 721.

■■ Here, plaintiff presented the expert testimony of Dr. Bieliauskas, a clinical psychologist and neuropsychiatrist, and Dr. Klawans, a neurologist. Both experts established the basis for their opinion as being the fact that plaintiff suffered from decreased memory, verbal formulation and comprehension, a lack of fine motor skills and decreased coordination, and a diminished intelligence quotient. Based on these findings, the two experts opined that plaintiff would experience difficulty with any job requiring bilateral dexterity and higher levels of understanding. As both experts had strong practical backgrounds in caring for and assisting patients with such difficulties and injuries, we find that the trial court's admission of their testimony was not in error.

In view of the court's error in directing a verdict reflecting agency, this cause is reversed and remanded for a new trial.

Reversed and remanded.

SCARIANO, P.J., and HARTMAN, J., concur.